From:
Deborah Davis, Ph.D.
Professor, Department of Psychology
University of Nevada
Reno, Nevada 89557

To:
Mr. Jonathan D. Sims
Attorney at Law
Siegle & Sims L.L.P.
The Astor Building
217 Broadway
Suite 611
NY, NY 10007

August 26, 2007

Re: Interrogation of Yang Feng Zhao

The following report is based on my review of the following materials:

Yang Feng Zhao deposition testimony pp 1 – 97

Mr. Zhao's corrections to his transcribed deposition

Detective NgaCheung's translation of Mr. Zhao's confession

The additional statement of Mr. Zhao signed 10/25/05

Police report recounting Mr. Zhao's confession

Plaintiff's complaint for the civil case

Mug Shot Pedigree, Yang Feng Zhao;

Complaint follow-up report (DD5) dated 12/11/01, interview of Yun Chen a/k/a "Jennifer;"

Complaint follow-up report (DD5) dated 12/11/01, interview of Yuhua Huang;

Complaint follow-up report (DD5) dated 12/11/01, interview of Peter Yee;

Complaint follow-up report (DD5) dated 12/11/01, interview of George Huang;

Two page hand written notes dated 9/23/04 regarding a meeting at the 5th Squad regarding the stabbing at Golden Box Karaoke bar, identifying "Tae Bao," an individual with a tattoo on his arm, as the killer of the security guard;

Mug Shot pedigree of Guang J. Lin;

Results of Evaluation/Comparison Latent Print Section, dated 12/15/01;

Complaint follow-up report (DD5) regarding latent prints, dated 12/17/01;

Complaint follow-up report (DD5) regarding interview of plaintiff, dated 4/3/03;

Complaint follow-up report (DD5) regarding statement of plaintiff, dated 10/25/05;

I have also interviewed Mr. Zhao via telephone through an interpreter.

A list of the cases in which I have testified as an expert as well as publications authored by me are attached hereto. I am being compensated at the rate of $250 per hour for all work including trial testimony.

**OPINION**

This preliminary opinion is offered subject to modification in the event relevant additional information is acquired.

The confession obtained from Mr. Zhao was clearly false. Since Mr. Zhao exhibited no propensity to confess falsely voluntarily (he repeatedly denied the allegations prior to and during the use of multiple interrogation tactics), the false confession is clearly the result of the interrogation to which he was subjected. Among the interrogation tactics employed in Mr. Zhao's interrogation were clearly unconstitutional uses of physical intimidation (pushing his face into the table) and both explicit threats concerning what would happen if Mr. Zhao failed to confess (such as deportation of his family) and explicit promises of leniency contingent on confession (a "light" as opposed to more severe penalty). Such explicit threats and promises are both unconstitutional and explicitly discouraged as such in prominent interrogation manuals and training seminars. In addition, threats and promises can be communicated indirectly through implication, as described below. All tactics can be made more effective by excessive length of the interrogation, which causes the person to both think less clearly and to become more and more driven to do anything (including to confess falsely) in order to escape the situation.

Although I currently have no information regarding standard training and practices of the NYPD, a recent survey of 14 police departments across the USA and 2 from Canada (Kassin et al., 2007; see attached bibliography) revealed that physical intimidation, explicit threats of consequences for not cooperating, and use of false evidence such as a failed polygraph were the least frequently used tactics.

Mr. Zhao also testified that the interrogator essentially told him what to include in his confession. This confession was drafted by Ng and signed by Mr. Zhao. It is characteristic of false confessions that the details must be fed to the suspect by police in some manner. Otherwise, the innocent person would have little ability to provide a narrative confession.

Finally, since it is well known that even constitutional interrogation tactics can and do elicit false confessions, it is imperative for police to investigate sufficiently to verify the validity of the confession. In this case, the NYPD had definitive exonerating evidence at its disposal which it failed to use, to Mr. Zhao's great detriment.

The basis of these opinions is below, followed by a more detailed statement of opinion.

## I. Evidence Concerning the Existence and Causes of False Confessions

For articles and materials referenced herein, refer to the attached bibliography for full references. Note that systematic reports of individual cases of false confession, analyses of the role of false confession in wrongful convictions, compilations of proven cases of false confessions and laboratory demonstration of the elicitation of false confessions existed prior to the interrogation of Mr. Zhao and were reported widely in a host of publications, seminars, trial testimony, and websites (including those of interrogation training groups such as John Reid Associates).

### A. How do we know that false confessions occur?

The following sources of data document the existence of false confessions:

1. Individual known cases of false confession in which

   a. A single individual confesses falsely to a single crime (such as in the present case or the cases of Peter Reilly or Michael Crowe who confessed falsely to murdering relatives; e.g., Connery, 1977)

   b. Multiple individuals confessed falsely to the same crime (e.g., the New York Central Park Jogger case)

   c. Single individuals confessed falsely to multiple crimes (e.g., confessions of Jerry Frank Townsend and Frank Lee Smith to serial murders committed by Eddie Lee Mosley)

A number of such individual case accounts were published prior to Mr. Zhao's prosecution (see Gudjonsson, 1992; 2003, Connery, 1977 and others).

2. Systematic Analyses of Proven Wrongful Convictions

The website of the Innocence Project (innocenceproject.org) where data on wrongfully convicted are posted, including the percent of proven wrongfully convicted who had falsely confessed and summaries of their cases (25% as of the 2004 report). Several other books have reported similar earlier analyses of wrongful convictions (e.g., Bedau & Radelet, 1987; Connors, Lundregan, Miller, & McEwen, 1996; Scheck, Neufeld, & Dwyer, 2000). Note that these analyses were published prior to the prosecution of Mr. Zhao.

3. Compilations of known false confessions and/or wrongful convictions.

Examples include Drizin & Leo, 2004 (compilation of 125 cases of known false confessions and description of the circumstances of the crimes and false confessions)

4. Surveys of convicted or incarcerated defendants

Gudjonsson (2003) reports surveys of incarcerated defendants asking whether they had ever confessed falsely to police. Approximately 12% reported doing so at some point. He also reports similar surveys of students. (See also Gudjonsson, Sugurdsson, Bragason, Einarsson & Valdimarscottir, 2004; Gudjonsson et al., 2006). The latter found that of those who had been interrogated, 7.3% claimed to have made false confessions to police).

5. Laboratory studies demonstrating induction of false confessions (see Kassin & Gudjonsson, 2004 for review). These studies have demonstrated the ability of common interrogation tactics to induce false confession to behaviors with financial or academic consequences (for example, falsely confessing to academic cheating). See also Blair, 2007; Horselenberg et al, 2006; Russano et al, 2005; Candel et al, 2005).

### B. Evidence Concerning Causes of False Confession

Excluding cases in which the confessor does so voluntarily, for reasons such as mental illness or motives such as notoriety, the vast majority of false confessions occur for one of three reasons (1) to escape a situation that is intolerable for the suspect, (2) because the suspect has come to believe that what he or she did is not a crime, and/or (3) because the suspect believes confession will result in the best legal outcomes (see Davis & O'Donhue, 2004; Davis & Leo, 2006; Drizin & Leo, 2004; Kassin, 1997 b; 1998; 2006; Kassin & Gudjonsson, 2004; Gudjonsson, 2003, 2006; Leo, 2001; Ofshe, 1989; Ofshe & Leo, 1997 a, b for reviews).

Interrogation tactics can cause each of the above three reactions in suspects.

The interrogation can become intolerable to suspects for the following reasons, among others: excessive length; deprivation of basic needs such as sleep, rest, food, water or bathroom; need to satisfy addictions such as cigarettes, drugs, alcohol, etc. (combined with the belief that terminating the interrogation will allow their satisfaction); preexisting stress (due to the crime, grief, etc.); stressors inherent to the interrogation (including

frustrations of interacting with police, isolation from sources of support, uncertainty and confusion, aversive tactics, uncomfortable furnishing or temperature, multiple interrogators, the fact of being accused and disbelieved, and others), individual vulnerabilities (such as excessive anxiety), and others (see reviews cited above).

Suspects can become convinced that what they are accused of is not a crime through interrogation tactics. This is achieved primarily through two of the most central interrogation tactics: *minimization or "theme development"* and *contrast based techniques* (including the "alternative question" which contrasts an obviously serious criminal scenario with one that appears non-criminal or less serious, with the implication that what the suspect did was the latter—e.g., "Tell me Jack, was this something you planned from the start, or is this something that happened when you were defending your own life?"). The first involves detectives suggesting a "theme" or scenario for how the crime happened that often appears not to be criminal at all to suspects. For example, the interrogator might suggest that the person killed another because the other person attacked him first with potentially deadly weapons. It is common cultural "knowledge" that self-defense is not a crime. He is then asked an alternative question such as above. Therefore, the person may confess to shooting another, fully believing he has not confessed to a crime and that he will be let go. (see Gudjonsson, 2003 for summaries of studies indicating that up to 40% of those who report confessing falsely report having done so for the purpose of, or with the expectation of, being let go (e.g., Sigurdsson & Gudjonsson, 1996).

Finally, suspects become convinced that confession is in their best legal interest through a combination of interrogation tactics. These are outlined in brief in Davis & Leo, 2006, and in much greater detail in the above referenced reviews. These include instilling a sense of hopelessness regarding establishing innocence through such tactics as presentation of false evidence, refusal to believe any claims of innocence or exonerating evidence, persistence in accusing the suspect across many hours or days, discrediting any potentially exonerating evidence, and others. Theme development, as described above, serves to minimize the apparent seriousness of the crime. This is in contrast to a number of statements designed to convince the suspect that if he fails to confess, this will be held against him (e.g., judges and juries will not like the person who lies and refuses to take responsibility as much as one who owns up to what he did and apologizes; if he refuses to tell "his side of the story" the much more serious version of the crime (for example, as presumably already told by coperpetrators) will have to be believed. In essence, interrogation tactics consist of a protracted "anti-Miranda" warning in which the message is that the suspect can only be "helped" by the interrogator and receive the best outcomes by telling the "truth" (which the interrogator believes to entail confession) *during the interrogation, before it is too late.* The suspect is led to believe the opposite of Miranda—that everything he says can and will be used for his benefit, and conversely, that failure to admit to the crime will be held against him by all to come (DA, judges and juries). These tactics are generally made more compelling by the detective's conveying sympathy and flattery to the suspect to build rapport, trust, and belief in the benevolence of the detective's motives. A number of studies have shown these tactics to be effective

in motivating false confession (see previously referenced reviews, and Davis, Follette & Leo, 2007).

Interrogators are not supposed to explicitly convey threats of negative legal consequences for failure to confess or promises of leniency for confession. Interrogation manuals explicitly discourage such behaviors. However, a great deal of research has shown that tactics such as the above are interpreted by suspects as very clearly conveying threats and promises, and that they are effective in increasing the risk of false confession.

Further, in many instances, such as in this case, interrogators do cross the line and explicitly threaten suspects, promise leniency for confession, and/or use physical force, deprivation of basic needs, or intimidation. Such behaviors are not promoted by the most prominent interrogation trainers or training manuals, but are sometimes practiced nonetheless.

It is partly for this reason (among others) that a chorus of interrogation scholars have called for recording of all interrogations, and preferably all interactions between police and suspects. Such recordings would presumably serve to both discourage such behavior, as well as to offer suspects proof if they did occur (in order to offset the greater credibility normally enjoyed by police officers). It is my understanding that recording of interrogations is not currently required by law or uniformly practiced voluntarily by the NYPD.

## II. Evidence Concerning Common Interrogation Training and Techniques

Evidence of the nature of interrogation techniques comes from several sources: (a) depictions in interrogation training manuals and training materials (e.g., Inbau et al., 2001), (b) scholarly analyses of interrogation techniques (see reviews cited above), (c) observational studies of actual interrogations that have coded and quantified the use of various techniques (e.g., Leo, 1996a), (d) personal observations of roughly 100 actual recorded interrogations, and (e) consultation with other interrogation scholars concerning their personal observations of recorded interrogations. The Inbau et al. 2001 manual and the many reviews cited above present and analyze these techniques in great detail.

The "Bible" of interrogation training is the manual by Inbau et al., (2001—which is the fourth edition). A number of additional training materials using the "Reid 9-Step" method are available from the John Reid Associates website. Although there are a number of other manuals and materials, virtually all are essentially minor variations on the Reid technique. The FBI trains the Reid technique, as indicated by training materials in my possession, their own articles in the FBI Law Enforcement Bulletin, and the scans of these materials in the powerpoint to be used in the case. John Reid and Associates offer training seminars all over the country and beyond—including in New York City, and claim to have trained over 300,000 law enforcement personnel at all levels in the United States.

Whether or not an individual officer was specifically trained by Reid or in techniques called the Reid method, he or she will almost certainly have been trained by others using the techniques. In addition to the pervasive Reid training of such a large portion of American police, this fact is likely because Reid developed the technique from long time observation of interrogations, and then fed a more systematic version back to the same pool of interrogators from which it was developed.

### III. Evidence Concerning Difficulties in Miranda Comprehension and Special Care Needed for Vulnerable Populations

A large body of literature has addressed (a) variations in how Miranda rights are administered, (b) general rates of comprehension, (c) how comprehension is affected by variations in presentation, and (d) what individual characteristics can compromise understanding of either the literal meaning of the words or the general meaning. For example, most can understand the words "You have the right to remain silent." However, research has shown that many interpret this to mean "until you are asked a question." Many more fail to understand what the function of an attorney would be, what one would do if present, and why it would be important. Comprehension of the actual meaning and function of the rights can be compromised in persons from different cultures, and for other reasons such as youth, IQ, mental illness and others (E.g., Rogers et al., 2007; Oberlander et al., 2003)

### IV. Analysis of Coercive Features of the Interrogation of Mr. Zhao as Reflected in Above Reviewed Materials

This opinion regarding coercive features of the interrogation is offered subject to revision upon receipt of any additional relevant information.

It is my opinion that the interrogation of Yang Feng Zhao (henceforth YFZ) included coercive features known to increase the risk of false confession. Although there are many, I have summarized several of the most important below. Perhaps the most egregious of these are the excessive length, use of false evidence (including false statements that his exonerating witnesses were instead testifying to his guilt), explicit statements linking YFZ's choice to admit versus deny responsibility to reduced charges and the use of explicit threats to deport his family. This interrogation stands out with respect to the very explicit references to the link between the suspect's willingness to admit his involvement and "explain" what happened and the nature of the charges to be filed. It also stands out with respect to threats to the suspect's family and the use of physical force and intimidation.

#### Miranda

The detective should have taken special care to administer Miranda, and establish that YFZ understood his Miranda rights. He is relatively young, uneducated, not native to our culture, and from a culture with vastly different laws and human rights.

Research on comprehension of Miranda rights has shown that comprehension is generally extremely poor, especially among younger, less educated, and less intelligent suspects. It is also poorer among those with less experience in the legal system, and difficulty in comprehension can be exacerbated by mental illness, some prescription drugs, alcohol and illegal drugs, and acute fatigue, illness or other ailments that could compromise cognitive functions.

It is particularly important to establish that vulnerable suspects do understand what they are being told, since they are more likely than not to misunderstand. Surprisingly, for example, many have been shown to believe that the right to remain silent means only that you can stay silent unless asked a question.

### Vulnerability to Interrogation Tactics

Vulnerability to coercion and/or false confession is increased by the same factors that can impair comprehension of Miranda rights. In addition to impairment of cognitive faculties, suspects can be more vulnerable due to inability to tolerate lengthy or stressful interrogations. This can be the result of such factors as sleep deprivation, stress, aversiveness of interrogation tactics, excessive anxiety, alcohol or drug use, length of the interrogation, the need to terminate the interrogation for interrogation-irrelevant reasons such as the need to get a fix or others. Vulnerability is also increased by lack of real knowledge of rights, of police prerogatives versus limitations, and other information concerning the legal system. A Chinese suspect may well posses exaggerated views of police power (including the ability to deport his family) that would not characterize native Americans to such a degree.

### Interrogation Tactics Present in this Case that are
### Known To Increase Risk of False Confession

Generally, interrogation tactics such as those specified by John Reid Associates and others are designed to lead the suspect to believe that confession is in his best interest. This is explicitly stated in well-known interrogation manuals, such as the Inbau et al., 2001 manual (the most widely known). This is done with a series of steps as outlined in the attached article.

- <u>Setup Question</u>

Detectives are trained to begin the interrogation section of an interview by asking the suspect what he thinks should happen to a person who committed the crime, and to ask if the suspect thinks there are any circumstances under which the person should be given a second chance, or to be sent to counseling rather than jail, etc. The effect of this is to make the suspect believe he may not be charged with a crime, or may be let go with a warning or mandatory counseling, rather than sent to jail. In laboratory studies this single section of the interview has been shown to increase the perception that the detective can choose what to do with the suspect, including potentially letting him go.

This, in turn, increases perceptions that confession is wise (because of the way this introduction combines with additional tactics).

- Positive Confrontation And The Presentation Of "Evidence"

Detectives are trained to follow the setup question with "positive confrontation"—consisting of confident assertions that the suspect did commit the crime and that the detective has the evidence to prove it. These confident statements of guilt are accompanied by descriptions of "evidence" against the suspect.

Studies of reactions to interrogation have shown that the biggest predictor of confession (both true and false) is the suspect's perception of the strength of the "evidence" (whether the suspect knows he is innocent or not). Those who feel there is overwhelming evidence against them—even if the evidence is misleading for an innocent suspect---tend to feel a sense of hopelessness about proving their innocence. The interrogation tactics are designed to accomplish just this sense of hopelessness so that the suspect will give up on trying to convince anyone of his innocence and turn to trying to minimize the consequences. The remaining tactics are designed to offer the suspect the perception that if he confesses he will obtain better long term legal outcomes than if he invokes Miranda or talks but refuses to confess.

A variety of "evidence" was brought up to YFZ, including video's showing him in proximity to the collapsing victim, a number of witness statements implicating him, alleged statements of YFZ's own exonerating witnesses that they identified him as the perpetrator, and including the claim that his mother believed him guilty.

Of particular pertinence for YFZ, presentation of false evidence is the tactic most strongly implicated in elicitation of false confessions (other than torture or induction of sufficient physical or emotional distress as to induce the suspect to do anything to get it over).

It should also be noted that although American Police have not yet reacted sufficiently to the extensive documentation of the potential of false evidence to elicit false confessions, other countries have outlawed presentation of false evidence for just this reason. Given this situation, it is particularly important NOT to present false evidence during an interrogation. If this is done, it is important to recognize the enhanced likelihood that the confession is false, and to take care to verify it with hard evidence.

- Sympathetic Detective with the "Time-Limited Offer"

Having communicated that overwhelming evidence implicates the suspect, the detective uses a tactic called "the sympathetic detective with the time-limited offer." The detective states that he thinks the suspect is a nice, stand-up, good person who just got in a bad situation—or similar flattery. He repeatedly refers to his positive feelings toward the suspect, and his desire to help him, but states that he can't help the suspect unless he "tells the truth." And, he must do so during the interrogation, because once the

interrogation is over, the detective will no longer be able or willing to help, and terrible charges will be filed because the worst account of the crime (as indicated by the evidence, witnesses, and co-perpetrators) will have to be believed. But no account is accepted as the truth other than the one the detective is promoting. Hence, the suspect is led to believe that the most serious version of the crime, with the suspect as the most responsible perpetrator, will be charged unless he "explains" his role in a way that is less serious (i.e., confesses to involvement).

The detective essentially says the way it looks at this point is that the crime was the most heinous version (e.g., planned in advance, motivated by depraved or cold, self-serving reasons, completely intentional and undeserved by the victim). All the evidence suggests this (perhaps including statements of a co-perpetrator), and that if the suspect does not tell "his side of the story" while in the interrogation room, he will be charged with the most serious version of the crime, and no one will be there to help him anymore. On the other hand, if he confesses and "explains" how it really happened (e.g., unplanned, accidental, instigated by the victim, and suspect played an unanticipated or minor role), things will go much better for him. Essentially, the detective is offering help only while in the interrogation, and only if the suspect confesses to the version suggested by the detective.

This tactic is, in essence, an offer of leniency contingent on confession, with explicit or implicit threats of how much more serious the outcomes will be if the suspect refuses to "tell his side." This tactic may have been used in this case, since the detective apparently explicitly offered to help YFZ to get a lighter sentence. The suspect was explicitly told that he would receive a "lighter" sentence if he confessed as opposed to 25 to life if he failed to do so, and that the detective would try to help him get the lighter sentence if he confessed.

- Minimization

Since most suspects will be wary of confession, the detective must convince them that the charges will not be all that serious if they confess. This is done through the process of "theme-development" whereby the detective offers various scenarios regarding how the crime took place that appear to minimize seriousness. These include things such as blaming the victim (e.g., for starting it), suggesting that the crime was unplanned, an accident, self-defense, etc., suggesting that it was a normal reaction under the circumstances and anyone would have done the same—and many others.

A number of published studies have shown that those hearing such suggestions expect to receive greater leniency if they admit to the suggested version of the crime.

Detectives in this case apparently suggested minimizing themes to YFZ involving fear, self-defense, intoxication, and others, and actually included same in the statement that was drafted for YFZ to sign.

- Explicit Mention of Legal Charges

Normally, detectives do not explicitly mention legal charges tied to the "maximized" (most serious) version of the crime versus the "minimized" (suggested less serious) version, since this is explicitly grounds for exclusion. However, the detectives in this case clearly crossed this line and explicitly stated on multiple occasions that confession would affect the severity of his sentence.

- Excessive Length

YFZ was arrested at three pm and confessed at approximately three am. During this time he was left alone in a cell for various periods, taken from one location to another, and interrogated by several different interrogators singly and in combination. This 12 hour period appeared to include approximately 6 hours of interrogation and 6 hours of waiting.

## Taking the Confession

YFZ states that the detective told him that he would essentially tell him what to put in his confession (p. 60-65 of his deposition). The Inbau et al (2001) manual offers instructions for how to get a confession in writing that will make it *appear* to those to come (such as juries) to be more authentic. Since I cannot read Chinese and cannot tell Chinese handwriting apart--it was difficult for me to ascertain the degree to which this occurred in this case. There are some scratch-outs with correction, but I could not tell whose they were. For this reason, I interviewed YFZ by telephone to ask him about the insertion. He reported that the changes were made by the detective and he was told to initial them. He did not know at the time why he was asked to insert his initials. Since the scratch-outs were replaced by the same word as the one scratched out, it appears that the only purpose for them was to cause YFZ to give the confession greater appearance of authenticity. This is a particularly egregious practice, since it makes it more difficult for fact finders to detect false confessions, particularly those that were, in fact, essentially fed to the suspect.

## Failure to Verify the Confession

All parties are aware that interrogations can elicit false confessions. Therefore, confessions should not be considered the end of an investigation, but rather a starting point for further investigation and verification (see Davis & Leo, 2006). It appears that no further investigation was conducted subsequent to the confession.

*Deborah Davis*

Deborah Davis, Ph.D.
Professor, Department of Psychology
University of Nevada
Reno, Nevada 89557