UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
YANG FENG ZHAO,

                 Plaintiff,      :     REPORT & RECOMMENDATION

               -against-      :     07 Civ. 3636 (LAK)(MHD)

CITY OF NEW YORK, DETECTIVE
NGA CHEUNG NG, DETECTIVE BILLY  :
MILAN, SGT. BRIAN CONLON and
"JOHN DOE #2",           :

              Defendants.   :
--------------------------------x

TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:

     Plaintiff Yang Feng Zhao commenced this lawsuit against a
number of New York City police detectives and the City of New York
in the wake of the December 2006 dismissal of a murder charge filed
against him more than one year earlier. In his amended complaint he
sues two police detectives (Dets. Nga Cheung Ng and Billy Milan),
a police sergeant (Sgt. Brian Conlon), and the City, contending
that they arrested him in October 2005 for a 2001 night club
murder, that they did so without probable cause, and that shortly
after his arrest they used physical violence, threats, and
psychological coercion to extract his consent to a manufactured,
false confession. He alleges further that they used the false
confession as well as lies to the District Attorney's Office of
Queens County to procure an indictment of him for that murder. As
a result, he says, he spent nearly a year in jail, after which time

1

he was released and the charge dismissed based upon the prosecutor's representation to the court that he was not involved in the murder.

Based on these allegations plaintiff asserts federal and state-law claims for false arrest and malicious prosecution, federal claims of excessive force and violation of his right not to incriminate himself,[1] as well as state-law claims for assault, battery, intentional infliction of emotional distress, defamation, and negligence. He also asserts a Monell claim against the City for pursuing practices or policies that countenance the types of constitutional violations alleged here, as well as for a failure to train and supervise police personnel in conducting investigations, assessing evidence, undertaking interrogations, and handling so-called cold cases. He seeks an award of compensatory and punitive damages against the individual defendants and compensatory damages from the City.

At the conclusion of discovery, both defendants and plaintiff

---

[1] Plaintiff attempts to characterize his self-incrimination claim more broadly as a substantive-due-process claim in his memorandum (Pl.'s Mem. in Opp'n to Summ. J. 30), but, as defendants note, in the Joint Pretrial Order ("JPTO") he lists only a "Fifth Amendment and Fourteenth Amendment right against self-incrimination" claim (JPTO Part V ¶ 4) and does not pursue a separate substantive-due-process claim. We therefore treat this claim, for summary judgment purposes, as a self-incrimination claim.

2

have moved for partial summary judgment. Defendants seek dismissal of (1) the Monell claim, (2) the federal false-arrest claim, (3) the federal excessive-force claim, and (4) all of the state-law claims, thus leaving the federal malicious-prosecution and self-incrimination claims for trial. Plaintiff of course opposes defendants' motion, and he asks for partial summary judgment on his federal and state-law claims for false arrest, seeking a ruling that the police arrested him without probable cause and that the City is liable for these wrongs. In addition, plaintiff has requested that, if the state malicious-prosecution claim is deemed unexhausted under the New York General Municipal Law, as defendants argue in their papers, he be given leave to file an out-of-time administrative notice of claim under New York Gen. Mun. Law § 50-e.

For the reasons that follow, we recommend that defendants' motion be granted in part and denied in part. We further recommend that plaintiff's motion be denied in its entirety.

## The Basic Facts

In the early morning hours of December 11, 2001, at the Gold Box Karaoke Club in Queens, a club employee named Danny Cabezas was fatally stabbed by a patron of the club. (Pl.'s Mot. for Summ. J. Ex. ("PX") 1). Cabezas was working as a bouncer that night (Huang

3

Dep. 8),[2] and shortly before the stabbing had been involved in an altercation with a group of patrons. (NYC 706[3]; PXs 5-6; Lau Dep. 49-55; Romano 5/14/08 Dep. 218-19; Milan Dep. 156-57, 186; Zhao Dep. 119-23). The events surrounding the stabbing, including the physical altercations between Cabezas and the patrons as well as the departure of that group of patrons after the stabbing, were recorded in part by several video cameras that were operating that night at the club. (See, e.g., NYC 706, 707, 708; PX 31).

Within hours of the incident the police interviewed a number of club employees. The manager of the club, George Huang, recounted that shortly before the killing, he was in a room at the club when he heard a noise, left the room, and observed Cabezas in the main hall area of the club, fighting with a number of male and female Chinese patrons who had been in Room 6 of the club. Huang reported that he had broken up the fight, and that Cabezas had then escorted those patrons out of the club. According to Huang, shortly afterward Cabezas returned along the hall from the direction of the

---

[2] The cited deposition transcripts are submitted by plaintiff in support of his motion for partial summary judgment. Additional pages of the depositions of Zhao, Milan, Ng, and Reibstein cited in this opinion are attached to the affidavit of Eric Siegle, Esq. submitted in opposition to defendants' motion. (Aff. of Eric Siegle, Esq. executed Nov. 5, 2008 ("Siegle Aff.")).

[3] The numbered "NYC" designations refer to the videotapes received by the police from the club and submitted to the court in support of these motions.

4

exit, clutching his chest, and then fell to the floor near Room 9. Huang further reported that two men from the group in Room 6 had remained behind, looking for their shoes, while Cabezas was escorting the others towards the exit. Only after Cabezas returned, already wounded, did the two men leave, and they had nothing in their hands. (PX 24; Wilkinson Dep. 32-37). It later transpired that plaintiff Zhao was one of these two men. (Zhao Dep. 124-27; Oct. 6, 2008 letter to the court from Eric W. Siegle, Esq. ("Siegle Letter") Ex. 2 at 34-38).

Ms. Yun Chen, a waitress, recounted to the police that Huang and a club employee named Peter (apparently assistant manager Peter Yee) had stopped a fight between Cabezas and some men who had been in Room 6. She stated that Cabezas had then escorted those patrons towards the area of the stairs where an exit led out of the club. Moments later, she said, she saw him return from the stairway area, holding his chest and bleeding from the stomach area. He then fell to the ground in front of Room 9. (PXs 20-21; Ng 10/16/07 Dep. 65-68, 71-73, 95-98). Ms. Chen did not see the stabbing itself. (Ng 10/16/07 Dep. 90-91).

Another waitress, Yu Hua Huang, recounted that she had heard some yelling and had looked out into the hall and seen some men descending the stairs. Shortly thereafter, Cabezas returned from

5

the area of the exit, clutching his chest. He then fell near her. (PX 22; Maline Dep. 69-74, 76-86). Ms. Huang also did not see the stabbing. (Maline Dep. 91-92).

The police also interviewed Peter Yee. He reported that he had been in a room playing cards with Huang when they heard a banging sound and overheard Cabezas arguing with some Asian men. They ran from the room into the hall and saw Cabezas fighting with approximately six men. Yee and Huang stopped the fight and told Cabezas to walk away and leave the men alone. According to Yee, Cabezas walked to the end of the hallway, where more fighting then erupted between him and the other men, who apparently attacked him. Yee ran towards the group to stop the fight and saw one Asian man, wearing a white ski jacket, leap up and strike Cabezas in the chest, possibly stabbing him. After Yee stopped this fight, Cabezas walked back down the hall and collapsed, bleeding profusely. (PX 23; S. Rivera Dep. 19-23, 38).

Both Huang and Yee spoke further with the investigating police (who included defendant Ng) at the 109th precinct that same night. At that time they observed some of the club videotapes. Watching the tapes, Yee recounted the second fight, which he said had occurred around the stairwell that led to an exit from the club. He reported again that a man had jumped past him and lunged at

6

Cabezas, and this time he identified that man on the video as a man who was long-haired and wearing a white T-shirt. (PXs 30-31; Ng 10/16/07 Dep. 125-28; Ng 5/23/08 Dep. 220-23). Huang also confirmed that the second fight had occurred by the stairwell and that Cabezas had then staggered down the main hall, where he collapsed in front of Room 9. (PX 17; Huang Dep. 16-17, 24-27, 120-21).

In the wake of these interviews and the review of the available videotapes, the police then investigating the murder inferred that the stabbing had taken place in a small area at the stairwell, near the second-floor entrance to the club, which was at the far end of the main hallway. They further inferred that the assailants were the men with whom Cabezas had fought minutes before, and that Cabezas, after being stabbed, had staggered down the main hallway for a short distance before collapsing. (See, e.g., Romano 5/14/08 Dep. 213-14, 216; Romano 10/18/07 Dep. 81-86; Romano 4/9/08 Dep. 229-31; Casazza Dep. 99-101; PXs 6-7). This version was reiterated by one of the investigators, Det. Vincenzo Romano, when he spoke to the press and asked, through news outlets, for public assistance in identifying the assailants. (Romano 5/14/08 Dep. 200-02; Romano 10/18/07 Dep. 81-86; PXs 6-7, 12).

This version of events appeared to be supported not only by the statements of the four eyewitnesses, but also by the videotapes

7

obtained from the club. One tape, NYC 706, labeled "main hallway" and "fight," shows what appears to have been the initial fight in the main hallway between Cabezas and a number of Asian men, followed by the termination of the encounter through the intervention of Huang and Yee. During and after the first fight the tape shows a number of people gathering in the hallway around the fight, but it is hard to discern what each person is doing. On the same tape Cabezas is depicted walking down that hall in the direction of the stairwell and second-floor exit, either preceded or followed by the men with whom he had just fought and some others. A few minutes later on the tape, two waitresses are seen in the hallway looking down the hall towards the stairwell and exit. At about that time Cabezas (or at least the top of his head) is seen coming away from that direction and seeming to stagger, with the waitresses looking at him with apparent concern. Cabezas then falls to the ground near Room 9, to the evident consternation of the waitresses, just as plaintiff is seen walking past him after having put on his shoes. (NYC 706).

On December 13, 2001, two days after the incident, Yee brought the police another videotape, which the police had overlooked, this one depicting the area around the stairwell, where the stabbing had apparently taken place. (Huang Dep. 123-24, 128). Indeed, Huang thought this the most important videotape for that reason. (Id. at

8

130-33). It was enhanced some days later by the police and designated "+STAB." (NYC 708; see also PXs 38-39). The picture is not clear on the copies of NYC 708 provided to the court,[4] but plaintiff's "3 camera view" video, copied from that tape and enhanced by a forensic video analyst, has a much clearer picture of the same video. The view shows a number of men who had been involved in the first fight appearing to leave the club, then returning and gathering in the area of the stairwell. It also seems to show a long-haired man in that area holding an object in his hand and lunging with the object into the area where Cabezas was apparently standing when he was stabbed. (Pl.'s "3 camera view" video; Romano 5/14/08 Dep. 213-14; Casazza Dep. 99-101; Ng 4/14/08 Dep. 16-21).[5]

Several days later the investigators created eleven still photographs from the various tapes, including five from the enhanced "+STAB" tape. Among these were photographs of the long-haired man holding an object at various points in the video. Based on the statements of the witnesses and the videotapes, Det. Romano

---

[4] Plaintiff provided both a video cassette and a DVD version of the relevant tapes.

[5] A third video of the stairs leading down to the exit shows the long-haired man putting an object in his pocket and rapidly leaving the club. (NYC 705; Pl.'s "3 camera view" video). It is unclear from the record when this tape became available to the police, although it was in their possession sometime in 2001. (Romano 10/18/07 Dep. 59).

9

concluded that this man had committed the stabbing. (Santaremo Dep. 7-29; Romano 5/14/08 Dep. 205-07, 213-16; PXs 5, 8-11, 13-15, 30-31, 67-69).

Included in the investigative file were two diagrams of the area of the club where the fights and stabbing had taken place. The markings on these diagrams correspond to the version of events described by the witnesses, including notations indicating that the stabbing had occurred at the end of the main hall near the stairwell. (PXs 42-43, 70).

The case file also contained a "wanted" card for a man named Guang Ju Lin, prepared in December 2001 by a detective on the case, Det. John Sjoholm, indicating that Lin was viewed as "possible perp[etrator] - photo ID made" for the crimes of Murder and Gang Assault. (Sjoholm Dep. 56-57; PXs 34-35). Sjoholm also prepared a card for plaintiff, labeling him only as a witness. (PXs 36, 37).

On April 3, 2003 defendant Ng interviewed Zhao. Plaintiff told Ng that he had been present at the Gold Box on the night of the murder but did not know who had done the stabbing. (Ng 10/16/07 Dep. 132-34, 138). On the same day, Ng interviewed a man named Tong Chen. Tong stated that he had heard that a man named Guang Ju Lin had been involved in the killing, and that Lin had moved out of

10

state. (Milan Dep. 311-12; PX 53).

In 2003 and 2004, Det. David Casazza, who was also working on the Cabezas investigation, undertook to search for Lin, who was the only person positively identified by name as involved in the Cabezas homicide. In his efforts he was able to trace Lin to the West Coast, which was consistent with the report of Tong Chen and the later account of another witness, Yi King, who mentioned that Lin had gone to California. (Casazza Dep. 48-58; PXs 48-50).

Defendant Milan took over the investigation of the Cabezas murder in the Spring of 2004. He did so after receiving a phone call from Cabezas's mother, who complained about the prolonged failure of the police to make an arrest. (Milan Dep. 65, 71-72). Milan obtained the case file, which contained, inter alia, DD-5s reflecting witness statements and investigatory steps taken by the earlier investigators, the videotapes, the crime scene diagrams, Det. Romano's Homicide Notebook, still photos from the videotapes, wanted cards for Guang Ju Lin, a wanted card for Zhao as a "witness," and witness statements. (Milan Dep. 72-75, 78, 124, 296, 324-25, 429-30, 491; PXs 20, 22-24, 35, 37, 52).

Some time after taking over the case, Milan was contacted by Det. Laureano Rivera, who was conducting an investigation of an

11

alleged extortion that involved some of the same men as were suspected of involvement in the Cabezas homicide. On September 23, 2004 Det. Rivera informed Milan that he had a confidential informant, named Lo San, who had told him that a man named "Taebo" had been present at the Gold Box Club on the night of the Cabezas murder, and that "Taebo" had been involved in the fight with Cabezas and had stabbed him. Rivera further reported to Milan that he believed that Lo San had obtained that information from another man, named Ah Jun, who had himself been present at the club at the time of the murder. (L. Rivera Dep. 33-34, 57-60; Milan Dep. 153, 373-74; PX 54). Indeed, Det. Rivera was able to identify Ah Jun on one of the videotapes from the club. (L. Rivera Dep. 31-41). Despite receiving this information, Milan apparently never sought to meet with either Lo San or his alleged source, Ah Jun. (Milan Dep. 153-54).

In April 2005 Det. Rivera contacted Milan and informed him that an F.B.I. agent had located one of the men who appeared in the Gold Box videotapes from the night of the Cabezas murder. This was an individual named Zhao Ken Chen, also known as Yi King. On April 29, 2005, Milan met with Yi King, together with an F.B.I. agent who served as an interpreter. Milan recognized Yi King from the videotapes as having been at the Gold Box on the night of the murder. (Milan Dep. 143, 379-80, 390, 392, 397). According to the

12

notes of the interpreter, Yi King reported that he had gone to the Gold Box with a man named Tai Bao; that Tai Bao, as well as two men known as Ah Gui and Ah Zhong, had been involved in a brawl with the bouncer; that Tai Bao had stabbed and killed the bouncer and then left the club; and that Tai Bao was in California. (Milan Dep. 143, 147-49, 397-99, 405-06; PX 56).

Possibly as a result of these various contacts, the Cabezas investigatory file contained a photograph derived from the video tapes that was labeled "Long Hair being held back - Tai Bao." (Mok Dep. 73; PX 3). In addition, at one point in the Spring of 2005 Milan noted to another investigator that he was seeking two individuals; one was Tai Bao, whom Milan identified from the video, and the other was Guang Ju Lin, also known as Ah Gui. (Mok Dep. 19-21, 43-44; Milan Dep. 145-55; Lau Dep. 28-29; PX 3).

Given the information received from the various sources -- including Lo San and Yi King -- as well as the descriptions from the four club employees and the videotapes, it is not surprising that Milan apparently initially focused on Tai Bao. (See Milan Dep. 145-55; Mok Dep. 43-44; PX 3). It also bears noting that one of the club videotapes showed that Tai Bao had hurriedly left the club without wearing his jacket despite the cold winter weather that night. (Pl.'s "3 camera view" video; NYC 705; Reibstein Dep. 52; PX

13

23). Also Milan was aware that Tai Bao had apparently suffered a bloody nose in the first fight, thus underscoring both his role in the initial assault and a possible motive to exact more striking revenge on Cabezas. (Milan Dep. 155-58, 519-21; NYC 706).

Although it appears that Milan made some efforts to locate Guang Ju Lin after he took over the case in 2004, he was unable to do so. (Milan Dep. 341-42, 344-45, 350-51; PX 58). In the course of those efforts, however, he did not pursue information reflected in the investigatory file. He did not speak with Dets. Sjoholm, Casazza, or Santeramo, and did not talk to eyewitnesses such as Peter Yee. He also did not follow up on various leads in the case file, including a photo of Guang Ju Lin in Det. Romano's Homicide Notebook, the crime scene diagram, or the enhanced photo stills from the videos. (Milan Dep. 284-89, 299-300, 320, 358, 361-62, 510-13, 516-17, 531, 544, 548, 550).

In September 2005 Milan apparently decided that Zhao was the murderer, and as a result he sought permission from Sgt. Conlon to arrest plaintiff. The asserted basis for his conclusion was his review of a portion of the unenhanced video tape of the main hall at the time of the stabbing. As noted, this tape showed the top of Cabezas's head when he apparently was staggering back from the area of the stairwell, as the waitresses watched, and then showed him

14

fall as Zhao passed by him on his way to the stairwell. (Milan Dep. 163-65, 416; PX 706). The tape concededly did not show Zhao's hand in contact with Cabezas and did not show Cabezas's chest area. (Milan Dep. 165; Conlon Dep. 36-37). Even though at least one of the videos was of poor quality, Milan did not request any enhancing or cleaning up of the video. (Milan Dep. 92; Conlon Dep. 181).

Milan showed this portion of the tape to Sgt. Conlon, stating that he believed it supported the notion that Zhao was the stabber. (Milan Dep. 416; Conlon Dep. 35-37). Milan discussed with both Conlon and Ng the fact that this theory was contradicted by the statements of the four club eyewitnesses, all of whom had reported seeing Cabezas walking from the stairwell area and then falling slowly in front of Room 9. (Milan Dep. 424-25). Conlon was also aware that Milan's theory was inconsistent with the account by Peter Yee of the assault on Cabezas in the stairwell area and the report by George Huang that he had seen Cabezas wounded in the chest already when he returned from the same small area near the stairwell. (Conlon Dep. 158; Milan Dep. 425; Ng 4/14/08 Dep. 65-67).

Having reviewed the portion of the videotape cited by Milan, Conlon authorized Milan to arrest Zhao. (Conlon Dep. 192-93). He based that decision solely on the videotape fragment that showed

15

Zhao walking past Cabezas. (Conlon Dep. 35-37, 228). In authorizing the arrest, Conlon did not ask Milan to attempt to resolve the contradiction between his theory and all of the witness accounts nor did he require Milan to talk to the earlier investigators. (Conlon Dep. 31, 73-75, 161; Milan Dep. 425). He also did not watch all of the tapes available of the incident, and did not require that the tape he had viewed be enhanced to reveal the underscan, that is, the portion blocked by the screen border, even though the Police Department had that capacity. (McCourt Dep. 18, 81-82, 102-03; Conlon Dep. 181). In this regard we note that plaintiff undertook that task during this lawsuit, and as a result, when Milan viewed the same videotape, as enhanced, he conceded that Zhao had not stabbed Cabezas since the victim was already falling before coming into contact with Zhao. (Milan Dep. 180-83, 185, 262).

On October 24, 2005 two detectives arrested Zhao without a warrant on a charge of having murdered Cabezas. (L. Rivera Dep. 13-18, 157; Zhao Dep. 130-35). Zhao has testified that he was taken to a Manhattan precinct and extensively questioned by Milan and Ng through an interpreter and then taken to a Queens precinct, where he was further interrogated. He reports that he consistently denied any involvement in the murder of Cabezas, that Conlon "patted" him on the face, and that Ng screamed at him, pushed his face down into the table, threatened him with physical harm (including prison

16

assaults), and threatened his family with deportation. According to Zhao, **Ng** finally wrote out a confession, which included falsified errors for credibility, and Zhao signed and initialed it because of fear for his and his family's safety. (Zhao Dep. 136-99; Siegel Letter **Ex.** 2 at 28-70 (plaintiff's testimony at 50-h hearing)).

In dealing with the District Attorney's Office, Milan never informed the prosecutors that he had spoken with Yi King, who had identified Tai Bao as the stabber. (Lomp Dep. 437). Also, apparently neither Milan nor Ng told the prosecutors about any of the other evidence developed by earlier investigators that suggested that the perpetrator was Tai Bao or that Guang Ju Lin was also involved. (Milan Dep. 503; Lomp Dep. 369, 431).

Plaintiff remained in prison from October 25, 2005 until September 22, 2006. (PX 61). During this period a grand jury heard testimony from Det. Ng describing Zhao's confession, and it returned an indictment charging him with murder. On December 18, 2006, the indictment was dismissed on the motion of the District Attorney. The prosecutor explained the request as being based on the fact that Zhao was not involved in the murder. (PX 62).

This lawsuit followed.

17

## ANALYSIS

Defendants' motion targets all of plaintiff's claims except for the federal malicious-prosecution and self-incrimination claims. Plaintiff seeks summary judgment on his false-arrest claims. We first summarize the general summary-judgment standards and then address the claims at issue.

### A. Summary Judgment Standards

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). It is axiomatic that the role of the court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

18

The party moving for summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 322; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). In making this judgment, the court must view the record in the light most favorable to the non-moving party. See, e.g., Hunter v. Bryant, 502 U.S. 224, 233 (1991); O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 61 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet his initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 161 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries his initial burden, the opposing

19

party must then shoulder the burden of demonstrating a genuine issue of material fact. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 322; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot "rely merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P. 56(e)(2); see, e.g., Amaker v. Foley, 274 F.3d 677, 680-81 (2d Cir. 2001), nor can he rely on his pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994).

To demonstrate a "genuine dispute," the opposing party must come forward with sufficient evidence to permit a reasonable jury to return a verdict in his favor. See, e.g., Anderson, 477 U.S. at 242, 248; Matsushita, 475 U.S. at 587; Byrnie v. Town of Cromwell, Bd. of Educ., 243 F. 3d 93, 101 (2d Cir. 2001). Alternatively, if

20

"the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983); see also Rogath v. Siebenmann, 129 F.3d 261, 267 (2d Cir. 1997); R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997).

When the parties have both filed motions for summary judgment, "a district court is not required to grant judgment as a matter of law for one side or the other." Ricci v. DeStefano, 530 F.3d 88, 109-10 (2d Cir. 2008). Rather, in these circumstances "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Bronx Household of Faith v. Bd. of Educ. of the City of New York, 492 F.3d 89, 96-96 (2d Cir. 2007) (citing Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002)). If the material facts are in genuine dispute, then both motions must be denied. See, e.g., S.E.C. v. Lyon, 605 F. Supp. 2d 531, 550 (S.D.N.Y. 2009).

## B. Assessment of Defendants' Motion

We first consider defendants' motion. In doing so we do not

21

adhere to the order in which defendants present their arguments, and instead first consider the federal claims asserted against the individual defendants. We then address the Monell claims and finally turn to the plaintiff's common-law claims.

1. False Arrest

To establish a constitutional claim of false arrest, the plaintiff must demonstrate (1) that defendant intended to confine him, (2) that he was conscious of the confinement, (3) that he did not consent to the confinement, and (4) that the confinement was not "otherwise privileged." Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995); see also Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); Corona v. Lunn, 2002 WL 550963, at *5 (S.D.N.Y. Apr. 11, 2002). There is no dispute that plaintiff satisfies the first three elements. The question is whether he can satisfy the last.

A showing of probable cause for an arrest provides a complete defense to a claim for false arrest. See, e.g., Weyant, 101 F.3d at 852. In the case of a warrantless arrest, the seizure is presumptively unlawful, and the defendant bears the burden of demonstrating that he had probable cause to make the arrest. See, e.g., Curry v. City of Syracuse, 316 F.3d 324, 335 (2d Cir. 2003);

22

Golden v. City of New York, 418 F. Supp. 2d 226, 232 (E.D.N.Y. 2006).

Probable cause exists when the arresting officer relies upon "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant, 101 F.3d at 852; accord, Singer, 63 F.3d at 119. In making this assessment, the court must consider the "'totality of the circumstances.'" Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) (quoting Illinois v. Gates, 462 U.S. 213, 230 (1982)). Thus, the analysis is highly fact-specific. It "turn[s] on the assessment of probabilities in particular factual contexts -- not readily, or even usefully reduced to a neat set of legal rules." Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) (citing Gates, 462 U.S. at 232).

Of particular relevance, the courts have stressed that, in determining whether an arrest is justified, an officer may not disregard plainly exculpatory evidence. Kerman v. City of New York, 261 F.3d 229, 241 (2d Cir. 2001) (citing Kuehl v. Burtis, 173 646, 650 (8th Cir. 1999)). Moreover, when there are significant evidentiary gaps or uncertainties, the police may not ignore them and simply make an arrest based on obviously spotty and

23

uncorroborated evidence. See, e.g., Oliveira v. Mayer, 23 F.3d 642, 647-48 (2d Cir. 1994) (citing BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued")). As one court in this district has noted, in assessing probable-cause questions "Second Circuit case law stresses the importance of investigation and corroboration." Wu v. City of New York, 934 F. Supp. 581, 587 (S.D.N.Y. 1996).

If there are genuine disputes as to the facts that would determine the existence of probable cause, then the claim must survive to trial. See, e.g., Douglas v. City of New York, 595 F. Supp. 2d 333, 340 (S.D.N.Y. 2009). That is the case here, as there are disputed issues of fact that preclude granting defendants' motion on this claim.

As noted, the initial investigation developed a set of fairly consistent eyewitness statements from four club employees suggesting (1) that a group of men had first engaged Cabezas in a brawl in the main hallway, (2) that this fight was stopped by Messrs. Huang and Yee, (3) that Cabezas and the pugilistically inclined patrons all moved to the end of the main hall, in the area of the stairwell leading to a door exiting the club, (4) that the

brawl resumed in that location, with Cabezas stabbed there, apparently by a long-haired man in a white shirt who leaped at him, and (5) that Cabezas then staggered back down the main hall, clutching his chest and falling to the floor in the vicinity of Room 9. Moreover, the video tapes from the club were consistent with this scenario, even depicting what appears to have been the stabbing by a long-haired man in a white shirt. The same accounts and tapes indicate that Zhao was not in the vicinity of the stairwell at the time of the stabbing, but rather was engaged in finding and putting on his shoes and then walking down the hallway as Cabezas staggered in the opposite direction and sank to the ground.

Further inquiries provided consistent support for this scenario, with several informants reporting that the stabber was a man named Tai Bao. In addition, one man who admitted being present confirmed that he had witnessed Tai Bao attack Cabezas with a knife, and described him in a manner consistent with Yee's observation of the second brawl with Cabezas. Moreover, other reports implicated a second man, Lin, as involved in the stabbing.

In formulating his theory of Zhao's guilt as the murderer, Milan relied on a small snippet of an unenhanced video tape showing only the top portion of Cabezas's head and not depicting Zhao's

25

hand actually touching the victim. Moreover, that theory contradicted the considerable body of evidence amassed by other investigators since the night of the murder. All of this evidence was not only known to various police officials, but was amassed as part of a systematic homicide investigation over a period of years and collected in a homicide case file for reference and use by current and subsequent investigators. Indeed, it is not seriously disputed that Milan and Ng (who was involved in the investigation from the start) knew, and Conlon knew or should have known, the basic conclusions of the other investigators and the basis for those conclusions. It also bears noting that the record does not reflect any effort by Milan either to clarify or resolve the evident conflict between his new theory and the prior fruits of investigative efforts from 2001 to 2005 or to justify simply rejecting the contrary evidence. Under these circumstances it cannot be said, as a matter of law, that the arrest of Zhao for murder was supported by probable cause.

Defendants do not appear to quarrel seriously with this conclusion. Rather, in an effort to save their motion, they proffer an alternative theory to justify the arrest. Noting that probable cause may be found for a crime, or crimes, other than the one for which an individual was arrested and charged (Defs.' Mem. in Supp. of Summ. J. 21-23) (citing, inter alia, Devenpeck v. Alford, 543

U.S. 146, 153-54 (2004))), they argue that even if the police did not have probable cause to arrest Zhao for the murder of Cabezas, they had a basis to arrest him for a host of other crimes arising from the group assault on the victim. These crimes include third-degree assault, second-degree harassment, third-degree menacing, disorderly conduct, second-degree reckless endangerment, second-degree riot, and unlawful assembly. (Id. at 21-22). All of these asserted crimes are based upon the assumption that Zhao either attacked Cabezas, assisted others in doing so, or attempted to do so before the stabbing.

In pressing this argument, defendants largely ignore the pertinent record, which consists principally of the video tapes. Those tapes show a large number of men in the hallway gathered around Cabezas, some of them seemingly pummeling him or otherwise engaged in efforts to cause him physical harm and other people simply standing or milling about or trying to get closer, either to participate or simply to observe. Zhao apparently appears in the videotape at some point, but defendants offer no indication as to where he appears or what he is doing that would justify a conclusion that he is committing a crime. Indeed, the deposition testimony of the Assistant District Attorney in charge of the case -- Richard Reibstein -- underscores the obscurity of the effort to derive any conclusion as to criminality from that video tape.

27

(Reibstein Dep. 353-54).

In pressing their point, defendants ultimately rely simply on the deposition testimony of Sgt. Conlon that he observed on the videotape what he viewed as an assault by Zhao on Cabezas. (Conlon Dep. 35-36). This unadorned conclusory statement is plainly insufficient to justify summary judgment on the probable-cause question. The test is, as noted, an objective one, and the evidence of the reasonableness of the determination by Sgt. Conlon is not his statement of how he interpreted the videotape -- a subjective inquiry -- but rather what the videotape itself shows. Since the videotape is, at the very least, ambiguous in that respect and since defendants offer no other evidence as to the role that Zhao actually played (as distinguished from Conlon's brief and conclusory account of his own mental processes), we cannot say that a trier of fact presented with the film could not conclude that it was too ambiguous to justify a reasonable police officer in concluding that Zhao was likely committing a crime.[6] In sum,

_____

[6] We note that plaintiff argues as an alternative matter that defendants have waived this version of their probable-cause defense by not including it in the JPTO. (Pl.'s Mem. in Opp'n to Summ. J. 26-27). We do not rely on this argument since the defendants' portion of the JPTO asserts that there was probable cause for the arrest based on the video as well as on information from a confidential informant. This general reference to the videotapes is sufficient, if not terribly enlightening, to preserve the argument. (We note that the defendants' asserted reliance on a confidential informant is not documented by defendants on their current motion, and hence we do not further

28

summary judgment on the federal false-arrest claim cannot be justified on the current state of the record.[7]

## 2. Excessive Force

Plaintiff asserts a claim of excessive force, alleging that defendants Milan and Ng used physical force and threats of violence and other retribution to extract his signature on a false confession authored by them. Defendants argue that this claim should be dismissed by way of summary judgment because plaintiff suffered, at most, only de minimis injury. (Defs.' Mem. in Supp. of Summ. J. 25-26). In support of this argument, defendants note that plaintiff testified at his section 50-h hearing[8] that the interrogators' actions of patting him on the face and pushing his face into the table caused him pain for about an hour, and they

---

consider it.)

[7] Defendants appear to seek summary judgment on plaintiff's state-law false-arrest claim on the same basis, that is, that the police had probable cause to arrest Zhao. See Osuna v. City of New York, 2009 WL 2356424, at *3 (S.D.N.Y. July 30, 2009) (citing Weyant, 101 F.3d at 852) (noting that the elements of state and federal claims for false arrest "are substantially the same under both United States and New York Law"). For the reasons already noted, triable issues of material fact preclude such relief.

[8] Section 50-h of the General Municipal Law authorizes the City to require an evidentiary hearing at which any person who files a notice of claim under section 50-e must appear for questioning by an attorney for the City. That was done in Zhao's case. (Siegle Letter Ex. 2).

29

further note that there is no record of plaintiff ever seeking medical treatment for any alleged injury. (Id. (citing Zhao Dep. 87-88)).

Since defendants' argument on the excessive-force claim is premised on a Fourth Amendment analysis, we assume for present purposes that the "reasonableness" standard imposed by that amendment applies to an allegedly abusive post-arrest station-house interrogation. See, e.g., Graham v. Connor, 490 U.S. 386, 394-95 (1989); Nimely v. City of New York, 414 F.3d 381, 390 n.7 (2d Cir. 2005). Cf. Albright v. Oliver, 510 U.S. 266, 280-81 (1994) (Ginsburg, J., concurring) (Fourth Amendment applies from time of arrest to initiation of criminal proceedings). In applying this test, the trier of fact must look to whether, in light of the circumstances confronting the officer, the amount and nature of the force used was "objectively reasonable." Graham, 490 U.S. at 397; Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002). As emphasized by the Supreme Court, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (citations omitted); accord, e.g., Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995). The analysis requires

30

"consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987); see also Maxwell v City of New York, 380 F.2d 106, 108-10 (2d Cir. 2004).

The evidence provided by plaintiff's deposition and 50-h testimony satisfies the pertinent constitutional standard for an allegation of excessive force, at least for purposes of summary judgment. See Graham, 490 U.S. at 397. The record offers not the slightest justification for the use of any force against Zhao during his interrogation. He was in custody, surrounded by at least two police detectives, and located within two presumably highly secure police precincts. In addition, and most crucially, there is no indication that at any point he offered or threatened any physical resistance or was in any other way uncooperative with the police except insofar as he initially declined to admit his guilt for a crime that he insisted he had not committed. It necessarily follows that if we credit his testimony on the point -- as we must for present purposes -- the force used against him was

31

unreasonable.

In seeking summary judgment on this claim, defendants argue one point only, that Zhao did not suffer a sufficiently serious injury to qualify for relief on such a claim. Citing a number of district court decisions, they say that his testimony reflects only a "de minimis" effect from the alleged unjustified force and that the absence of more serious injury precludes liability. (Defs.' Mem. in Supp. of Summ. J. 26). We disagree.

A number of courts have indicated that a claim of excessive force in effectuating an arrest must be supported by some evidence of injury, although they have not specified the precise extent of the required injury or even indicated why the use of completely unjustified force by the police that does not result in physical harm could not yield a constitutional claim for which the appropriate relief would be nominal damages. See, e.g., Williams v. City of New York, 2007 WL 2214390, at *11 & n.175 (S.D.N.Y. July 26, 2007) (citing cases). Compare Espada v. Schneider, 522 F. Supp. 2d 544, 555-56 & n. 12 (S.D.N.Y. 2007) (indicating that excessive-force claim under Fourth Amendment can yield nominal-damages award). This line of cases has largely rested on the courts' assumption that plaintiff must prove some adverse physical effect, some even requiring long-term injury or medical treatment. See,

32

e.g., Washpon v. Parr, 561 F. Supp. 2d 394, 406-07 (S.D.N.Y. 2008);
Rincon v. City of New York, 2005 WL 646080, at *5 (S.D.N.Y. Mar.
21, 2005).

We respectfully disagree with those courts that have at least
impliedly imposed a requirement for documented or long-term
injuries in such circumstances as a predicate to liability. In
doing so, we note that the extent and nature of the injury, if any,
is typically relevant in an arrest context not merely on the
question of the amount of damages, but also because it is probative
of the amount and type of force actually used by the arresting
officers, and that in turn is likely to reflect on the
reasonableness of that force, though reasonableness of course turns
as well on the circumstances of the arrest, including -- most
notably -- whether and to what extent the arrestee offered any
resistance. It also bears emphasis that an arrest is by nature an
act involving some degree of dominion, and hence force, that the
police must exercise over the arrestee, and thus it makes some
sense to require a showing of some minimum amount of injury as a
marker of a more-than-nominal use of force, in order to trigger a
Fourth Amendment inquiry.

Even in the arrest context, however, the Second Circuit has
indicated that a very minimal injury is sufficient to trigger

potential liability. Thus, for example, in Robison the plaintiff testified that an officer had pulled her out of her car, yanking and twisting her arm, and had thrown her against the vehicle. Her only injury was a bruise of unspecified extent and degree, with no indication that it persisted or required any medical treatment. Nonetheless the Court of Appeals held this showing sufficient for plaintiff's Fourth Amendment excessive-force claim to survive summary judgment. 821 F.2d at 923-24; see Mickle v. City of New York, 297 F.3d 114, 120-21 (2d Cir. 2002) (citing cases) (reversing judgment as a matter of law when plaintiff alleged injury from the use of handcuffs that were assertedly too tight); Davis v. City of New York, 2007 WL 755190, at *12-13 (E.D.N.Y. Feb. 15, 2007) (denying summary judgment when plaintiff alleged redness and soreness in shoulder after officer kicked her); see also Blair v. City of New York, 2009 WL 959547, at *10-11 (E.D.N.Y. Mar. 31, 2009) (rejecting need to show continuing or long-term injury or medical treatment).

In this case, as noted, the alleged excessive force did not occur at the time of the arrest. Rather, it took place while plaintiff was being questioned at two precincts, and the record reflects no reason for any use of force at that stage. In such circumstances any force is potentially illegitimate -- again depending on the circumstances -- and hence the notion that the

34

injury must be more than "de minimis" to trigger an assessment of a Fourth Amendment claim appears unjustified.[9] Even if we exclude arguendo the possibility of a nominal damage award, we do not believe that any particular quantum of physical injury is required in such circumstances, since the evidence demonstrates that no use of force was justified. That is the scenario here, which involved an interrogation of an unresisting previously-arrested individual.[10]

In any event, the record here is sufficient to deny summary judgment. The plaintiff testified that, apart from having "patted" his face, Det. Ng pressed his head down against the table for some unspecified period of time and with some unspecified degree of force. Zhao further testified that this left him in pain for about

---

[9] Were it otherwise, the result could be plainly perverse. For example, if, while questioning a physically passive suspect, a police officer slapped him repeatedly or punched him in the jaw, but left no broken bones or bruises, that conduct would not trigger liability for the use of excessive force. Indeed, arguably if the police adopted a careful regime of waterboarding of arrestees, the same result would ensue -- no long-term injuries, no fractures, no medical treatment, hence no liability.

[10] In making this observation, we emphasize that to the extent that some courts have ruled out liability for a "de minimis" use of force, see, e.g., Smart v. City of New York, 2009 WL 862281, at *7 (S.D.N.Y. Apr. 1, 2009); Williams, 2007 WL 2214390, at *11 & n. 174, we do not disagree. The focus of our point is the occasionally articulated standard that the injury (not the amount of force) must be more than de minimis, however that is defined or not defined.

35

an hour. Such transient pain should suffice[11] for the claim to
survive summary judgment.[12]


3. The Monell Claims


Plaintiff seeks to hold the City liable for the constitutional
torts of the individual police defendants. Defendants have moved
for summary judgment on this set of claims, arguing that plaintiff
cannot prove municipal responsibility for any such wrongful
conduct.


To establish the City's liability on these claims, plaintiff
must show that the City bore some responsibility for violations of

---

[11] We assume for present purposes that plaintiff's testimony
about Sgt. Conlon "patting" his cheek (see Zhao Dep. 185) --
unless creatively interpreted to mean that defendant was slapping
his cheek -- would be insufficient to show that more than de
minimis force was applied.

[12] Defendants also seek a ruling that plaintiff's false-
arrest, malicious-prosecution, and excessive-force claims be
deemed to arise only under the Fourth Amendment, and that his
self-incrimination claim be treated as arising only under the
Fifth Amendment, arguing that none of those claims should be
considered as a Fourteenth Amendment claim. The point of
defendants' request is obscure, as plaintiff's constitutional
claims necessarily arise under the Fourteenth Amendment, which
incorporates certain provisions of the Bill of Rights to apply to
the states. See Planned Parenthood v. Casey, 505 U.S. 833, 847
(1992); Duncan v. Louisiana, 391 U.S. 145, 147-48 (1968). To the
extent that defendants request a ruling as to which amendments
fit which of plaintiff's claims without seeking to dispose of
those claims on summary judgment, we see no reason to offer an
advisory opinion when addressing their summary-judgment motion.

36

his constitutional rights. See, e.g., City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue.") (emphasis in original). To do so, he must demonstrate both a constitutional violation and a sufficient causal relationship between the violation and a municipal policy or practice. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); Batista v. Rodriquez, 702 F.2d 393, 397 (2d Cir. 1983).

Plaintiff may demonstrate the existence of a policy or practice in a variety of ways. First, he may provide evidence of a formal policy officially adopted by the municipality. Monell, 436 U.S. at 690. Second, a single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered policy and thus subject a municipality to liability. Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 405-06 (1997); see generally Pembaur v. City of Cincinnati, 475 U.S. 469, 481-84 (1986). Third, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Monell, 436 U.S. at 690-91. Fourth, where a municipality's failure to provide

37

adequate training or supervision of its agents rises to the level of deliberate indifference, section 1983 liability may lie against the municipality. See, e.g., Brown, 520 U.S. at 407-08; see generally City of Canton, 489 U.S. at 388-89. Finally, we note that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

The first step in a Monell analysis is to determine whether agents of the City have violated the plaintiff's constitutional rights. If so, the question remains as to the role, if any, of City policy or practice in bringing about those illegal acts. See, e.g., Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 124-31 (2d Cir. 2004) (analyzing first whether plaintiffs had shown a violation of their constitutional rights and then analyzing plaintiffs' theories of municipal liability). For reasons already noted, we conclude that there are at least triable issues of fact regarding the viability of plaintiff's claims for false arrest and excessive force, and we further note that defendants have not challenged the triable status of plaintiff's claims for malicious prosecution and self-incrimination. Hence the remaining question is whether plaintiff has proffered sufficient evidence to permit a trier of

38

fact to find that the City bore some legal responsibility for those alleged violations of his rights.

In the course of briefing the current motion, plaintiff has limited his theory of <u>Monell</u> liability principally to the contentions that the City failed adequately to train the officers in a variety of respects, including permissible techniques of interrogation and evaluation of evidence, and also failed adequately to supervise and discipline officers inclined to make meritless arrests or to engage in physically abusive behavior with suspects. Defendants contend that plaintiff cannot prevail on these contentions. We agree.

(a) <u>Failure to Train</u>

To impose liability on a municipality for a failure to train its police officers, a plaintiff must establish not only that his rights were violated and that the violation is attributable to the training failure, but that the City, in failing to adequately train the police, acted with at least deliberate indifference to the rights of the public. <u>See</u>, <u>e.g.</u>, <u>City of Canton</u>, 489 U.S. at 388-89. To meet this demanding standard, <u>see</u>, <u>e.g.</u>, <u>id.</u> at 391-92, the plaintiff must demonstrate that the relevant policy-maker knew "to a moral certainty" (1) that the police will confront a given set of

39

circumstances that present the officers with a difficult decision, (2) that adequate training would make that decision easier and more reliable or that there is a history of bad choices having been made in that situation, and (3) that the wrong choice in such circumstances will frequently trigger a violation of the constitutional rights of a member of the public. See, e.g., Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007); Green v. City of New York, 465 F.3d 65, 81 (2d Cir. 2006). Moreover, the plaintiff must also "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, [that is,] that it actually caused the constitutional deprivation." Jenkins, 478 F.3d at 94 (citing Green v. City of New York, 465 F.3d 65, 81 (2d Cir. 2006)).

Plaintiff's showing manifestly fails to create a triable issue with regard to most of these elements. In attacking the Police Department training program, he contends that the individual defendants received insufficient training time on custodial interrogations, that the training materials do not tell the officers when to accept the claims of an arrestee that he is innocent and when to terminate the interrogation, that the materials do not advise against "impermissible promises," and that the materials do not offer guidance in detecting false confessions of guilt or minimizing the risk of false confessions. He further

criticizes one passage in a training manual that suggests that, in administering Miranda warnings, the police say to the suspect, before asking if he is willing to waive his rights, that if he does not agree to talk "you won't get to tell your side of the story." Finally, he also complains about the absence of a City policy mandating the videotaping of all interrogations. (Pl.'s Mem. in Opp'n to Summ. J. 6-13).

As a separate matter, plaintiff also contends that the Department does not adequately advise its officers as to the capacities of its in-house Technical Assistance Response Unit. (Id. at 13-15). This omission assertedly explains the failure of the individual defendants to obtain an enhancement of the video footage that ultimately demonstrated that Zhao had not stabbed Cabezas. (Id.).

Plaintiff fails to proffer evidence sufficient to demonstrate, or to permit a trier of fact to find, that the Police Department has acted with deliberate indifference in designing its training program or that the omissions that he cites led to the violation of his rights by the individual defendants. Hence, regardless of whether the criticisms of the training program have any merit, his Monell claim does not.

41

Plaintiff offers no evidence that the amount of time devoted in training to custodial interrogations -- the exact amount is uncertain since the various individual defendants offered varying time estimates (Milan Dep. 442-43; Ng. Dep. 81) -- is self-evidently inadequate, much less that it is inconsistent with supplying the basic guidance needed by the officers, or that the failure to devote more time to this subject by itself makes it more likely that the police will mishandle the questioning of suspects already in custody. He also offers no evidence that the alleged shortness of time devoted to the subject is linked to a pattern of coerced confessions[13] or that it caused the asserted violation of his rights by the individual defendants.

Plaintiff's further assertion that the training is deficient in not providing guidance about when to believe a suspect's denial of guilt and when to stop the questioning is equally devoid of substance. We assume for purposes of discussion that many arrestees, when questioned, deny their guilt, but plaintiff fails to offer any indication of what police officers should be taught in

_____

[13] Plaintiff lists a set of cases, two from 1989 and 1990 and the rest from 2000, in an apparent effort to demonstrate a pattern of false confessions, which we assume he means to use as evidence of some form of training inadequacy. (Pl.'s Mem. in Opp'n to Summ. J. 6; Am. Compl. ¶ 71). He offers no information about these cases or the circumstances of what we can only assume were confessions that later were repudiated, and he makes no effort to supply a link between these cases and any training deficiencies.

42

the way of discerning whether those denials are truthful. Presumably the principal way in which criminal investigators ascertain the truth or falsity of claims of innocence is through the use of the full array of investigative techniques to unearth evidence, and plaintiff does not suggest that the training materials are generally deficient in discussing those investigative techniques.[14] If plaintiff is implying that officers should also be given some additional training in psychological assessment of suspects -- a point he never makes explicitly -- that suggestion is not tantamount to a demonstration of manifest deficiency in training and offers no link whatsoever to a pattern of coercive interrogations caused by police officers' failure to understand that many suspects' denials of guilt are credible. The argument equally fails because it offers no evidence that such training in psychology would have altered the conclusion of the individual defendants that Zhao was guilty.

As for plaintiff's reference to "impermissible promises," we take that to refer to a suggestion that the police allegedly made to Zhao that if he confessed, he would receive lenient treatment. (Zhao Dep. 193-94). This argument is baseless.

_____

[14] We address below the one criticism that plaintiff launches about training in investigative techniques other than interrogation -- that is, the failure to advise officers of the capacity of the Department's TARU to enhance videotapes. (See p. 46, infra).

43

Plaintiff offers no reason to believe that it is inappropriate to mention to a suspect that his cooperation may yield a lesser charge or sentence, and he offers no evidence to suggest that a failure by the Department to prohibit such a comment reflects deliberate indifference to the rights of arrestees or tends to cause false confessions. He also offers no evidence to suggest that the absence of such a reference made to Zhao would have led him not to confess. Plaintiff's case is based on the contention that he consistently denied his guilt and that he was forced to sign a false document by physical violence and threats about his fate and that of his family if he continued to insist on his innocence. Hence, in any event he offers no evidence that his signing the document was linked to an impermissible promise rather than to illegal affirmative behavior by the interrogators -- a form of conduct that he never shows was encouraged by Police Department training.

As for the Department's asserted failure to teach its officers how to spot or prevent a false confession, again, plaintiff offers no competent evidence that this is a common problem that requires more specific training. Moreover, and still more important, he utterly fails to show how the absence of such training is linked to the violation of his own rights. As noted, he is not claiming that he chose to make a false confession and that the individual

44

defendants failed to spot its falsity, but rather that they manufactured a false confession and compelled him to sign it.

The other training issue that plaintiff raises concerning interrogations involves the way in which Miranda warnings should be administered. He seems to complain that the suggested comment about a suspect's opportunity to tell his side of the story impermissibly encourages the suspect to waive his right to silence or counsel. Again, plaintiff offers no evidence that there is a pattern of suspects waiving their right to silence because the police make this statement,[15] but still more crucial is his failure to offer any evidence that this is what the defendants told him or that such a statement caused him to waive his Miranda rights.

Plaintiff presses two other theories lumped under the training rubric. Both are inadequately supported to survive summary judgment.

_____

[15] We note that had plaintiff made this showing, the police detectives's actions could be found to be a violation of his Fifth Amendment rights. United States v. Plugh, ___ F.3d ___, 2009 WL 2341966, at *6-7 (2d Cir. July 31, 2009) (upholding district court's grant of a motion to suppress when defendant had invoked his Fifth Amendment rights to remain silent and to a lawyer but made self-incriminating statements after officers, inter alia, "repeatedly [told] the defendant that any cooperation would be brought to the attention fo the AUSA" and "that he was about the be taken to the Marshal's office, so that if he wanted to make any statements this was the time.").

45

First, he complains that the Police Department did not adequately train its officers about the capacities of the Department's TARU unit, including particularly its ability to expand the field of vision of some types of video tape. Whether this be the case or not, plaintiff fails to offer evidence that this omission should have been recognized by the ultimate policy-maker to pose a substantial threat of constitutional violations. There is simply no evidence that suspects other than plaintiff have been caught in the toils of the criminal justice system because police officers or officials did not see the potentially accessible edges of videotapes as a result of not knowing that TARU could reveal those margins.

Second, plaintiff complains about the refusal of the Police Department to videotape all custodial interrogations. This policy position is certainly a debatable one -- indeed, it has drawn much respectable criticism. See, e.g., William A. Geller, "Videotaping Interrogations and Confessions," The FBI Law Enforcement Bulletin, Jan. 1994, available at http://findarticles.com/p/articles/mi_m2194 /is_nl_v63/ai_15155548; Cornelia Grumman, No More Excuses. Go to the Tape, Chi. Trib., Apr. 21, 2002, available at The Pulitzer Prizes 2003 - Editorial Writing, http://www.pulitzer.org/archives /6679; Jim Trainum, The Case for Videotaping Confessions, Los Angeles Times, Oct. 24, 2008, available at http://www.latimes.com

/news/opinion/commentary/la-oe-trainum24-2008oct24,0,7918545.story;
Senator Schneiderman, Innocence Project and Others Champion
Mandatory Electronic Recording of Interrogations, NewsLI.com, Apr.
14, 2008, available at http://www.newsli.com/2008/04/14/senator
-schneiderman-innocence-project-and-others-champion-mandatory-ele
ctronic-recording-of-interrogations. Nonetheless, that is not the
same as demonstrating that the Department's refusal to adopt this
recommendation can be found to reflect deliberate indifference to
the constitutional rights of suspects, including plaintiff's. To
make a triable showing on this score, plaintiff would have to
demonstrate that the Department was aware that there was a
significant likelihood of forced confessions in the absence of
videotaping, that the Department chose not to require such taping
despite its awareness of that pattern, and that had the proposed
policy been in place the defendants would not have coerced
plaintiff into signing a false confession. While such a case might
conceivably have been made here, plaintiff has simply failed to do
so, thus leaving the analytical steps to the reader's imagination,
unlinked to any specific evidence. Such speculation does not permit
a finding of municipal liability, particularly based on the
Department's apparent adherence to a policy choice that has been
viewed as well within the broad discretion of local law enforcement

agencies.[16]

(b) <u>Failure to Supervise</u>

Plaintiff's alternative legal theory for municipal liability rests on the contention that the Department failed adequately to monitor and supervise the conduct of Dets. Milan and Ng. He cites a fairly extensive list of complaints to the Civilian Complaint Review Board and some internal investigations by the Internal Affairs Bureau as indicative that both men were inclined to misconduct of one sort or another, and he contends that the Department was on notice that they were likely to engage in the sort of abusive conduct of which he accuses them. We find the evidence offered on this point insufficient to survive summary judgment.

To sustain a <u>Monell</u> claim based on a failure to supervise or discipline, the plaintiff must demonstrate that the decision-maker was on notice of a potentially serious problem of unconstitutional conduct, that the need for corrective action was obvious, and that the decision-maker failed to investigate or take action in

---

[16] Again, we note that plaintiff's bare citation to six criminal cases as exemplifying the problem of not recording interrogations is simply not competent to establish the implicit propositions for which they are apparently cited.

48

circumstances suggesting deliberate indifference to the rights of those being harmed. See, e.g., Amnesty Am., 361 F.3d at 128; Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). If the decision-maker in fact took some action, then the plaintiff faces a particularly onerous burden to show not merely that the action was inadequate -- that is, that the employee later misbehaved once again -- but that the response "was so patently inadequate to the task as to amount to deliberate indifference." Reynolds v. Giuliani, 506 F.3d 183, 192-93 (2d Cir. 2007).

Plaintiff primarily relies on a lengthy series of CCRB complaints about Det. Milan and IAB inquiries concerning Det. Ng in making this argument. With regard to Milan, plaintiff notes, from a prior court order, that Milan had eight CCRB complaints filed against him and seven IAB complaints and that Ng had 14 IAB complaints. (Pl.'s Mem. in Opp'n to Summ. J. 17 (citing Zhao v. City of New York, 2007 WL 4205856, at *1 (S.D.N.Y. Nov. 21, 2007)). Based on an in camera review of these materials, we determined that six of the CCRB complaints against Milan were potentially relevant since two involved claims of false arrest and excessive force, two involved claims of excessive force, one involved a claim of false arrest and one involved a claim of excessive force during an interrogation. Zhao, 2007 WL 4205856, at *2. As for Ng, we ordered production of three IAB case files because they reflected

accusations of dishonest conduct, and hence were potentially relevant as impeachment material. Id. It is from these documents that plaintiff seeks to make his failure-to-supervise Monell case.

The problem with plaintiff's showing is that he fails to demonstrate that the Police Department manifested deliberate indifference to a pattern of actions by these two detectives that were predictive of the sort of behavior of which plaintiff now accuses them. Of the pertinent CCRB complaints against Milan, the CCRB investigated them and none were substantiated. (Siegle Aff. Ex. 8).[17] Although such a designation is not -- as defendants argue -- conclusive on a failure-to-supervise claim, see, e.g., Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir. 1986), the list (or pile) of complaints cannot by itself justify a finding of deliberate indifference. From the documentation it is apparent that investigations were done or attempted (subject to, and dependent on, cooperation by the complainant), and the CCRB determined that the claims were not justified or were at least not demonstrated to have validity. Given only that showing, plaintiff cannot sustain his claim. It bears emphasis that this type of Monell claim might be sustained by evidence either that the Department, faced with colorable or valid complaints, did not pursue any inquiry or made

---

[17] The dispositions of the pertinent complaints are listed as: Complainant Uncooperative, Unsubstantiated, Exonerated, Administratively Closed, and Unfounded.

only such a half-hearted effort as to demonstrate that it was not interested in determining the facts, or that it determined that there was a basis for the complaint and still chose not to act. Indeed, that was the nature of the case presented by the plaintiffs in Fiacco, and the circuit found that such a showing sufficed to justify a verdict for them on their Monell claim. Id.

Plaintiff here, however, does nothing of the sort. He simply mentions the large number of complaints about Milan and the nature of the allegations, and insists that a jury could find from that bare proffer that the City was deliberately indifferent to the rights of suspects in its handling of Milan. This is insufficient, since, as noted, the Department did in fact conduct investigations, through the CCRB, and the results did not sustain any of the claims. Under these circumstances, plaintiff cannot show that the City disregarded a serious risk that Milan would violate the rights of members of the public.

As for Ng, the only pertinent complaints, all before the IAB, involved questions of personal honesty. These included suggestions that he had falsified his identity or authority on at least one occasion and that he was working in one or more illegal enterprises in his spare time, as well as associating with people engaged in certain illegal activities. (Siegle Aff. Ex. 8). One investigation

51

led to a finding of impropriety and a modest sanction, and another ended inconclusively, assertedly because too much time had passed since the alleged improprieties. (Decl. of Afsaan Saleem, Ass't Corporation Counsel, executed Oct. 15, 2008, Ex. F at 109-10, 133; Ex. M at NYC 773). While these outcomes may fairly be viewed as troubling insofar as there appeared to be some indication of serious misconduct by Ng, the evidence does not lend meaningful support to the notion that the Department had a basis for believing that, if left undisciplined, Ng would engage in wrongful conduct by arresting someone whom he had no basis to believe was guilty or by using excessive force against a suspect. We deemed the IAB complaints relevant for use in impeaching Ng, Zhao, 2007 WL 4205856, at *2, but the City's arguably modest efforts to discipline him do not speak to the sort of misconduct that plaintiff alleges in this case.

In sum, plaintiff fails to demonstrate a viable basis for a Monell claim based on the disciplinary records of Dets. Milan and Ng.

4. The State-Law Claims

Defendants next turn their attention to certain of plaintiff's state-law claims. They seek summary judgment, on a variety of

52

grounds, on his claims for malicious prosecution, assault and battery, intentional infliction of emotional distress, and defamation.[18] We address their arguments in the order in which they make them.[19]

## (a) Malicious Prosecution

Defendants seek dismissal of plaintiff's common-law claim for malicious prosecution. They argue that dismissal is mandated because plaintiff did not comply with the statutory prerequisite to suit embodied in the New York General Municipal Law since he failed to file a timely notice of claim for this legal theory. We first review the pertinent chronology and then examine the parties'

---

[18] Defendants' only argument for summary judgment on plaintiff's state-law false-arrest claim is their contention that the arrest was supported by probable cause. We have already rejected that argument, see pp. 22-29, supra, and thus do not address his state-law false-arrest claim in this section.

[19] It appears that defendants seek dismissal of all of the state-law claims not only as against the City, but also as against the individual defendants. (Defs.' Mem. in Supp. of Summ. J. 27-32). Plaintiff's response does not argue otherwise, and indeed seems plainly to assume that if such a claim does not survive against the City, the same result follows with respect to the other defendants. (See, e.g., Pl.'s Mem. in Opp'n to Summ. J. 26, 50). Insofar as some of these claims may be dismissed solely for failure to comply with statutory administrative-exhaustion requirements, an argument might be pursued that those claims could survive against the individual defendants, see, e.g., Bick v. City of New York, 1997 WL 639236, at *5-6 (S.D.N.Y. Oct. 14, 1997) (citing cases); Kalpin v. Cunningham, 60 A.D.2d 997, 998, 401 N.Y.S.2d 659, 659-60 (4th Dep't 1978), but since plaintiff does not argue for such a result, we do not address it here.

respective arguments.

Plaintiff was released from prison on September 22, 2006. Pursuant to section 50-e of the General Municipal Law, he filed a notice of claim with the City on November 14, 2006, asserting a variety of tort claims, including a claim for malicious prosecution. In outlining the pertinent facts, including specifically the "DATE OF OCCURRENCE," he specified that the torts in question took place from "October 24, 2005, through the release of the defendant from prison on September 22, 2006, and continuing through the present, as the Queens District Attorney's Office has not yet dismissed the indictment against claimant, although said dismissal is expected." (Siegle Letter Ex. 1 at second page). On December 18, 2006, the Queens District Attorney requested and was granted dismissal of the indictment against plaintiff on the basis that he had not been involved in the murder of Cabezas. The City subsequently requested an administrative hearing on plaintiff's notice of claim, as authorized by section 50-h the General Municipal Law. On January 19, 2007 plaintiff testified at the hearing in support of his notice of claim. In testifying, he recounted all of the basic facts pertinent to his malicious-prosecution claim, including the fact that, subsequent to his filing of the notice of claim the prior November, the District Attorney had -- as predicted in that notice -- obtained the

54

dismissal of the indictment. (Id. Ex. 2 at pp. 78-81). In February 2007 the City provided Zhao's attorney with a transcript of his testimony for signature, and he reviewed it, signed it under oath and returned it to the City on March 1, 2007. (Id. Ex. 2 at first page).

In plaintiff's original and amended complaints in this lawsuit, filed May 8, 2007 and April 21, 2008, he alleged that he had "delivered [the notice of claim] to the City within ninety (90) days after the claim[s] herein sued upon arose and before commencement of this action." (Compl. ¶ 15; Am. Compl. ¶ 14). In defendants' answers, they denied this allegation without further elaboration, but did not assert an affirmative defense against the malicious-prosecution claim predicated on lack of jurisdiction or failure to exhaust administrative remedies. (See, e.g., City of New York Answer ¶ 15).

The defect in the original notice of claim upon which defendants premise their motion is that it was premature in asserting the malicious-prosecution claim. Dismissal of the charges is a required element of such a claim, see, e.g., Broughton v. State of New York, 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 94 (1975); Engel v. CBS, Inc., 145 F.3d 499, 502 (2d Cir. 1998), and that event had concededly not occurred at the time of the filing of the

notice of claim in November 2006. Since the statute requires that a notice of claim be filed within ninety days after the accrual of the claim, N.Y. Gen. Mun. Law § 50-e(1)(a), the original filing was itself not effective to satisfy the administrative-exhaustion requirement. See Vitale v. Hagan, 71 N.Y.2d 955, 957, 528 N.Y.S.2d 823, 823-24 (1988) (adopting Vitale v. Hagan, 132 A.D.2d 468, 470-72, 517 N.Y.S.2d 725, 727-28 (1st Dep't 1987) (Murphy, J., dissenting)).[20]

_____

[20] At one point plaintiff seems to attempt to distinguish Vitale because Justice Murphy's opinion notes, and appears in part to rely upon, the fact that the City had given the plaintiff "ample notice" of the defect, because it had asserted an affirmative defense and moved to dismiss on the basis of prematurity, and nonetheless the plaintiff had not sought to cure the error. Vitale, 132 A.D.2d at 471, 517 N.Y.S.2d at 728. (See Pl.'s Mem. in Opp'n to Summ. J. 46). In contrast, plaintiff says, in this case defendants did not assert such an affirmative defense and did not mention the defense until the preparation of the Joint Pretrial Order. This argument is unpersuasive for two reasons. First, in this case defendants denied the timeliness allegations of the original and amended complaints, thus at least putting plaintiff on inquiry notice. See, e.g., Ismail v. Cohen, 706 F. Supp. 243, 248-50 (S.D.N.Y. 1989) (citing Vitale, 71 N.Y.2d at 957, 528 N.Y.S.2d at 823-24) (invoking estoppel because defendants' answer admitted plaintiff's allegations of section 50-e compliance; court notes that "[i]f defendants had properly denied the notice of claim allegations in the complaint, plaintiff could have moved to cure any defect."). Second, it is apparent from Justice Murphy's opinion that he was not squarely relying on the notice point, since he further observed that, even if the defect in the notice of claim was harmless, the courts are bound by the statute, observing that they "do not have the power to dispense with statutory conditions precedent to the institution of a lawsuit against a municipal corporation. . . . [E]ven service of a complaint within the 90-day period after the action arises does not excuse service of a valid notice of claim." Vitale, 132 A.D.2d at 471, 517 N.Y.S.2d at 728 (citing Davidson v. Bronx Mun. Hosp., 64 N.Y.2d 59, 61-62, 484 N.Y.S.2d 533, 534-35 (1984)).

56

In seeking to overcome this difficulty, plaintiff proposes a number of theories, all but one of which plainly do not suffice. We first address those that do not persuade.

Plaintiff argues, for example, that the filing of a premature notice of claim does not create a jurisdictional bar to the assertion of the malicious-prosecution claim, citing Jastrzebski v. City of New York, 423 F. Supp. 669, 675 (S.D.N.Y. 1976). (See Pl.'s Mem. in Opp'n to Summ. J. 41). That decision, which noted that the plaintiff had filed a premature complaint as well as a premature notice of claim, was based on (1) the notion that the policy underlying the section 50-e requirement was to give the City an opportunity to investigate the claim and address it administratively prior to litigation, and (2) the absence of prejudice to the City in that case because it had had ample opportunity to assess the claim before the lawsuit was filed. Id. at 675-76. If Jastrsebski were good law now, plaintiff's argument would be compelling, since the early filing of the claim notice, only 34 days before the claim had accrued, gave the City adequate notice and the opportunity to assess the claim, an opportunity of which it apparently availed itself. The problem is that subsequent New York caselaw appears inconsistent with that reasoning. Indeed, the Court of Appeals decision in Vitale, which is controlling on us, appears squarely inconsistent with the analysis in Jastrsebski.

57

Plaintiff also asserts that defendants should be estopped from invoking the administrative-exhaustion defense since they never pled it in their answers and never moved for dismissal. Rather, they waited until the expiration of the time period for seeking leave to file an out-of-time notice of claim (one year and 90 days from accrual, see N.Y. Gen. Mun. Law § 50-e(5)), thus ambushing plaintiff. (Pl.'s Mem. in Opp'n to Summ. J. 46) (citing, inter alia, Bender v. New York City Health & Hosps. Corp., 38 N.Y.2d 662, 668, 382 N.Y.S.2d 18, 20-21 (1976)).[21]

The short answer to this contention is that the line of cases beginning with Bender does not encourage the use of estoppel as broadly as plaintiff implicitly suggests. In Bender the Court of Appeals observed:

> We believe that where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes

---

[21] Plaintiff does not argue that defendants have waived the defense as a result of their failure to assert it as an affirmative defense, a reticence presumably referable to the fact that the New York courts have consistently held that the defense of failure to comply with section 50-e need not be pled as an affirmative defense since the requirement is a prerequisite to suit. See, e.g., Laroc v. City of New York, 46 A.D.3d 760, 761, 847 N.Y.S.2d 677, 679 (2d Dep't 2007) (citing cases); see also Wade v. New York City Health & Hosps. Corp., 16 A.D.3d 677, 793 N.Y.S.2d 68, 69 (2d Dep't 2005) (citing cases). Since plaintiff does not make this precise argument, we need not delve into the question of whether the state-law rules on pleading affirmative defenses are binding in federal court under Fed. R. Civ. P, 12(b).

58

his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have raised. The equitable bar to a defense may arise by virtue of positive acts, or omissions where there was a duty to act. By applying the doctrine of equitable estoppel to notice of claim situations, the courts may insure that statutes like section 50-e of the General Municipal Law, do not become a trap to catch the unwary or the ignorant.

38 N.Y.2d at 668, 382 N.Y.S.2d at 20-21 (citations omitted). The courts have interpreted this passage fairly narrowly and have not permitted application of the estoppel principle in circumstances comparable to those encountered here. See generally Hamptons Hosp. & Med. Center, Inc. v. Moore, 52 N.Y.2d 88, 93-94 n.1, 436 N.Y.S.2d 239, 241-42 n.1 (1981) ("That holding [in Bender], addressed to an unusual factual situation, is of very limited application and should not be read as diminishing the vitality of the general rule that the doctrine of estoppel is not applicable to agencies of the State acting in a governmental capacity.").[22]

The defendants were under no obligation at the outset to advise plaintiff of the defect in his notice of claim. See, e.g.,

---

[22] Bender involved a rather unusual situation, in which the plaintiffs had filed timely notices of claim with the City instead of with the newly created Health and Hospitals Corporation, and the Law Department then conducted depositions and hearings on the notices of claim without informing the claimants that the notices had been filed with the wrong agency. Even so, the Bender court simply remanded for further consideration of the estoppel issue, noting the need for more factual development. 38 N.Y.2d at 669, 382 N.Y.S.2d at 21.

Wade, 16 A.D.3d at 677, 793 N.Y.S.2d at 69; Rodriquez v. City of New York, 169 A.D.2d 532, 533, 564 N.Y.S.2d 384, 385 (1st Dep't 1991) (finding no estoppel based on agency not citing untimeliness and proceeding with section 50-h hearing). Moreover, when plaintiff filed suit, under New York law the defendants were not obliged to assert an affirmative defense or to move to dismiss, and correspondingly plaintiff was not entitled to rely on the absence of such a pleading or motion. In any event, as noted, defendants in this case did in fact deny the key allegation from the complaint, that the notice of claim had been timely, thus putting plaintiff on notice of a defect. Compare Ismail, 706 F. Supp. at 249-50. Moreover, this is not a defect of which plaintiff's counsel might justifiably have been unaware, since it turned on a well-established pair of legal principles -- the requirement that criminal charges be dismissed as a predicate to a malicious-prosecution claim and the rule that a notice of claim filed before accrual of such a claim does not satisfy the statute. Compare, e.g., Bender, 38 N.Y.2d at 668-69, 382 N.Y.S.2d at 21 (noting plaintiff's assertion that date of transfer of control of Bellevue Hospital from the City to the Health and Hospitals Corporation "was not a matter susceptible of public discovery").

Plaintiff also asks, in the alternative, that in the event that he is deemed to have not complied with section 50-e, this

court should grant him leave, pursuant to Gen. Mun. L. § 50-e(5), to file an untimely notice of claim. The short answer to this request is that such an application must be made within one year and ninety days after the accrual of the claim, see, e.g., Pierson v. City of New York, 56 N.Y.2d 950, 954, 453 N.Y.S.2d 615, 617 (1982); Armstrong v. New York Conv. Centr., 203 A.D.2d 170, 170-71, 610 N.Y.S.2d 267, 268 (1st Dep't 1994), and plaintiff's request, first embodied in a letter application to this court dated October 6, 2008, is untimely, since it came nearly 22 months after accrual of the malicious-prosecution claim.[23]

Plaintiff's remaining argument presents a closer question. In substance, he argues that even though the original notice of claim was defective in not specifying that the charge against him had been dismissed (because that event had not yet occurred), the court in which the resultant lawsuit is pending has discretion to determine that this defect was cured by plaintiff's testimony at

_____

[23] We note that a number of courts within this circuit have concluded, based on the wording of section 50-e(7) of the General Municipal Law, that any such an application must be made to a state court. See, e.g., D'Antonio v. MTA, 2008 WL 582354, at *6 (S.D.N.Y. Mar. 4, 2008); Costabile v. County of Westchester, 485 F. Supp. 2d 424, 431 (S.D.N.Y. 2007); Henneberger v. County of Nassau, 465 F. Supp. 2d 176, 200 (E.D.N.Y. 2006). The Second Circuit has not decided this issue. See Parise v. New York City Dep't of Sanitation, 306 Fed. Appx. 695, 697 n.2 (2d Cir. 2009) (declining to determine whether, in light of wording of section 50-e(7), federal court can choose to disregard notice-of-claim defect under N.Y. Gen. Mun. Law § 50-e(6)).

the 50-h hearing and his submission of the executed transcript of that hearing to the City within the time frame for filing a proper notice of claim -- that is, within 90 days after the malicious-prosecution claim accrued. Plaintiff's point seems to be (1) that the New York courts have recognized their own discretion to treat documents other than the notice of claim form as substitutes for the formal claim form, (2) that the exercise of that discretion is guided by the underlying principle that the City be given adequate notice of the claim to permit it to conduct a proper investigation pre-lawsuit, and (3) that in the absence of prejudice to the City, this more liberal approach to what constitutes the notice of claim is permissible and encouraged. (Pl.'s Mem. in Opp'n to Summ J. 37-38 (citing Donlon v. Bd. of Educ., 2007 WL 108470, at *3 (W.D.N.Y. Jan. 12, 2007); Mennella v. Uniondale Union Free Sch. Dist., 287 A.D.2d 636, 637, 732 N.Y.S.2d 40, 42 (2d Dep't 2001); Bucalo v. East Hampton Union Free Sch. Dist., 351 F. Supp. 2d 33, 36-37 (E.D.N.Y. 2005); Kushner v. Valenti, 285 F. Supp. 2d 314, 316 (E.D.N.Y. 2003))). According to plaintiff, by the time of the 50-h hearing, the charge against him had been dismissed, the City's attorney questioned him about the facts underlying the claim, he testified that the indictment had been dismissed and that he had prevailed, and these facts were reduced to a document -- the transcript of his hearing -- which he signed under oath and provided to the City, thus ensuring that it had full and timely

62

disclosure, and hence suffered no prejudice.

Apart from the recognized discretion of the courts to determine what qualifies as a notice of claim, there is a statutory provision that appears to embody at least the general policy cited by plaintiff. Section 50-e(6) states that, "[a]t any time after the service of a notice of claim, and at any stage of an action or special proceeding to which the provisions of this section are applicable, a mistake, omission or defect made in good faith in the notice of claim required to be served by this section, not pertaining to the manner or time of service thereof, may be corrected, supplied or disregarded, as the case may be, in the discretion of the court, provided it shall appear that the other party was not prejudiced thereby." N.Y. Gen. Mun. Law § 50-e(6). Arguably, this court may "disregard" the error with regard to the initial notice of claim if plaintiff can satisfy the statutory prerequisites of a good-faith error and demonstrate no prejudice.

Bearing in mind that we are limited to predicting how the New York courts would resolve these arguments, we conclude that through one or the other of these last two approaches, the New York Court of Appeals would find that plaintiff has sufficiently complied with section 50-e to preserve his malicious-prosecution claim. The problem with plaintiff's original notice of claim is that, although

63

it sought ot invoke the malicious-prosecution claim, it could not properly do so since the indictment had not yet been dismissed. As such it was legally ineffective, although it did provide practical notice to the City that plaintiff was seeking to assert such a claim and that he expected that the remaining element of the claim -- the dismissal of the charges -- was likely to occur in the near future. The questioning and testimony at the hearing confirmed the accrual of the claim by way of the dismissal of the indictment, and provided the details required for a notice of claim, including the fact of the dismissal and the date, as well as the pertinent facts concerning the original filing of the charge against plaintiff, facts also recited in the original notice of claim. In short, the transcript of the 50-h hearing, though not in the form of a notice of claim, provided the very information that was lacking in the original notice as well as all other facts required for such a notice, and it did so within the statutory 90-day window for asserting a claim.[24]

---

[24] The New York cases that have uniformly rejected treating the filing in court of a complaint as a substitute or corrective notice of claim, see Davidson, 64 N.Y.2d at 61-62, 484 N.Y.S.2d at 534-35; Davis v. City of New York, 250 A.D.2d 368, 369-70, 673 N.Y.S.2d 79, 81 (1st Dep't 1998), are consistent with our analysis. The underlying policy of the statute is to ensure that before litigation is commenced the City is given an adequate opportunity to investigate the claim. See, e.g., Felice v. Eastport/South Manor Cent. Sch. Dist., 50 A.D.2d 138, 143, 851 N.Y.S.2d 218, 222 (2d Dep't 2008) (citing Teresta v. City of New York, 304 N.Y. 440, 442-43, 108 N.E.2d 397, 398 (1952)); Altmayer v. City of New York, 149 A.D.2d 638, 639, 540 N.Y.S.2d 459, 460 (2d Dep't 1989). Necessarily, the use of a filed complaint as

64

There is also no suggestion that the City was prevented by this somewhat unorthodox two-stage filing from investigating the pertinent facts. Indeed, the questions that its counsel posed at the 50-h hearing underscored its ability to examine the facts in a timely manner. There is also no indication that the City was prejudiced in any other way. Moreover, it bears mention in this respect that if plaintiff had proceeded in strict conformity with the contemplated statutory procedure, the City would also have been faced with a two-stage notice-of-claim process. As defendants themselves note, some of plaintiff's claims -- notably his common-law claims for assault and battery as well as defamation -- accrued in September 2005, and hence he was obliged to file a notice of claim for those causes of action before the criminal charges had been dismissed, whereas he could not have filed a notice for the malicious-prosecution claim until after December 18, 2006.

There is also no reason to question that the error made by plaintiff in his original filing was in good faith. He certainly did not benefit in any way by filing his malicious-prosecution claim before the contemplated dismissal of the indictment. In short, the error was presumably a failing by counsel to appreciate that under Vitale he could not properly file such a claim until the formality of the dismissal had taken place.

---

notice would be entirely inconsistent with that goal.

65

In the somewhat unusual circumstances of this case, we conclude that the state courts would deem the submission of the executed transcript to the City as either an adequate notice of claim or as a permissible correction of an error in the original notice of claim, thereby justifying the court in which the lawsuit was pending in "disregard[ing]" the original error. N.Y. Gen. Mun. Law § 50-e(6).[25] We recognize that the statutory language referring to an error could be read more narrowly to contemplate omissions of required information from a timely notice of claim, but the underlying policy repeatedly cited by the state courts is a practical one, and we infer that those courts would ultimately conclude that this policy was sufficiently satisfied in this case to permit plaintiff to proceed with his claim against the City.

---

[25] As a technical matter we believe that for purposes of section 50-e(6) this court has jurisdiction to make the decision to "disregard" an error in the notice of claim. The wording of that section -- particularly the use of the term "disregard" -- plainly contemplates that the court in which the lawsuit is pending would be the one to make that decision. Although that interpretation suggests some tension with section 50-e(7)(b), which specifies an application in "the supreme court or . . . county court . . . (b) if an action to enforce the claim has been commenced, in the county where the action is pending . . . .", we very much doubt that the legislators contemplated that a federal court hearing a state-law claim could not make the decision whether to disregard an error in a notice of claim even though, had the lawsuit been filed in state court, the trial judge could do so. In making this point, we do not necessarily disagree with those courts that have held that an application for leave to file an untimely notice of claim -- a matter procedurally independent of a pending lawsuit -- must be made in state court under section 50-e(7).

66

(b) Assault and Battery

Defendants seek dismissal of plaintiff's claims of assault and battery. They note that the claims arose on or about October 24 or 25, 2005, shortly after plaintiff's arrest, and that he did not file a notice of claim until November 14, 2006. Since the statutory deadline for filing such a notice is 90 days after the accrual of the claim, N.Y. Gen. Mun. Law § 50-e(1)(b), his deadline for filing was January 23, 2006, and accordingly his filing was nearly ten months late.

As is evident from our prior discussion, compliance with the filing requirements of section 50-e is mandatory even if the claim is asserted in federal court. See, e.g., Hardy v. New York City Health & Hosps. Corp., 164 F.3d 789, 793 (2d Cir. 1999). Since plaintiff failed to file a timely notice of claim for these legal theories -- as he now concedes (Pl.'s Mem. in Opp'n to Summ. J. 50) -- his claims must be dismissed.

(c) Defamation

Defendants similarly challenge the viability of plaintiff's claim against the City for defamation. The purportedly defamatory statements came in a public announcement on October 26, 2005, and

67

yet the notice embodying this claim was not filed until November 14, 2006, more than one year later. The notice was untimely, and hence the claim is time-barred, as plaintiff now also concedes. (Id.).[26]

## (d) Intentional Infliction of Emotional Distress

Based on plaintiff's allegations about the course of conduct of the individual defendants, he seeks to assert a claim for intentional infliction of emotional distress. The seminal decision by the New York Court of Appeals in the early stages of the development of this tort observed that it applies to "conduct exceeding all bounds usually tolerated by decent society," Fischer v. Maloney, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 992-93 (1978) (quoting Prosser, Torts § 12, p. 56 (4th ed.)), and is reserved for "extreme and outrageous conduct." Id. (quoting Restatement (Second) Torts § 46, subdiv. 1). The Court further cautioned that "it may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where

---

[26] Defendant also attacks the claim as insufficiently pled and as barred by a privilege for law-enforcement announcements to the public about matters of public concern. (Defs.' Mem. in Supp. of Summ. J. 33-35). In view of plaintiff's concession that the claim should be dismissed on the ground of untimely notice of claim, we need not address these other proffered grounds for dismissal.

the conduct complained of falls well within the ambit of other traditional tort liability." 43 N.Y.2d at 557-58, 402 N.Y.S.2d at 993. Although this last comment was dictum, Judge Weinstein subsequently observed that it "has been consistently applied by lower state courts and federal courts applying New York law." Moore v. City of New York, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002). That appears still to be the case. See, e.g., Alhovsky v. Ryan, 2009 WL 2432688, at *11 (S.D.N.Y. Aug. 7, 2009); In re MTBE Prods. Liab. Litig., 528 F. Supp. 2d 303, 312 (S.D.N.Y. 2007); accord, e.g., McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc., 256 A.D.2d 269, 270, 682 N.Y.S.2d 167, 169 (1st Dep't 1998); Butler v. Delaware Otsego Corp., 203 A.D.2d 783, 784-85, 610 N.Y.S.2d 664, 655-66 (3d Dep't 1994); Naccarato v. Scarselli, 124 F. Supp. 2d 36, 44 (N.D.N.Y. 2000). But cf. Dana v. Oak Park Marina, Inc., 230 A.D.2d 204, 208-10, 660 N.Y.S.2d 906, 909-11 (4th Dep't 1997) (seeming to recognize claim for intentional infliction of emotional distress despite potential application of statutory claim for invasion of privacy).

In this case the alleged conduct fits well within the traditional tort theories of false arrest, malicious prosecution, and assault and battery. Accordingly, the claim of intentional

69

infliction of emotional distress will not fly.[27]

Finally, we note that this type of claim depends upon proof that the actions of the defendants have "been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Murphy v. Am. Home Prod. Corp., 58 N.Y.2d 293, 303, 44 N.Y.S.2d 232, 236 (1983) (quoting Restatement (Second) Torts § 46); accord, e.g., Colliton v. Cravath, Swaine & Moore LLP, 2008 WL 4386764, at *12 (S.D.N.Y. Sept. 24, 2008). Even if allegations of false arrest, malicious prosecution, and excessive force might conceivably meet this rigorous test in some rare circumstances, that does not appear to be conceivable here, where (1) it is conceded that Zhao was not only on the premises of the club on the night in question, but was

_____

[27] Defendants also argue that the claim, insofar as asserted against the City, is barred as a matter of public policy, citing one of a series of Appellate Division cases to say so. (Defs.' Mem. in Supp. of Summ. J. 30 (citing, inter alia, Lauer v. City of New York, 240 A.D. 543, 659 N.Y.S.2d 57, 58 (2d Dep't 1997)). Lauer cites to, and is preceded by, a string of Appellate Division decisions, none of which appear to articulate the policy in question, but they ultimately trace back to the New York Court of Appeals decision in Brandt v. Winchell, 3 N.Y.2d 628, 170 N.Y.S.2d 828 (1958) (noting that official action undertaken at malicious instigation of member of public was itself presumed to be proper). Whether the decision in Brandt is properly invoked to block a claim of intentional infliction of emotional distress asserted against the City in the current circumstances -- involving alleged misconduct by City agents -- is a matter that we need not explore or decide.

70

apparently with a group of men some of whom assaulted, and at least one of whom murdered, Cabezas, (2) Zhao appeared on a video tape passing by the victim just as he fell to the ground, and (3) the force allegedly used on him by the interrogating detectives, even if excessive, was hardly of such brutality as to take this out of the mainstream of cases involving excessive force after arrest.

(e) Negligence

Defendants also seek summary judgment on plaintiff's claim of negligence, asserting that there is no tort under New York law for a negligent law-enforcement investigation, which seems to be plaintiff's theory. (Defs.' Mem. in Supp. of Summ. J. 35; Am. Compl. ¶ 150). That is correct, see, e.g., Johnson v. Kings County Dist. Attorney's Office, 308 A.D.2d 278, 284-85, 763 N.Y.S.2d 635, 640 (2d Dep't 2003), and hence that claim cannot survive.

In seeking to avoid this result, plaintiff recharacterizes his claim as based on negligence in hiring or retention, or possibly in training and supervision. (Pl.'s Mem. in Opp'n to Summ. J. 52-53). In making this argument, plaintiff concedes that he cannot pursue such a claim if he is allowed to sue the City under a respondeat superior theory for the individual defendants' common-law torts (id. at 54), but he notes that defendants seek dismissal of all of

71

those claims. Accordingly, to the extent that dismissal may be granted on the other tort claims, he asserts entitlement to pursue a negligence theory against the City. (Id.).

This approach is not supported by any legal authority of which we are aware. The City concedes that the individual defendants were acting within the scope of their employment when engaging in the conduct of which they are accused. That concession opens the City to potential respondeat superior liability and precludes a claim of negligent hiring, training, or supervision. See, e.g., Annunziata v. City of New York, 2009 WL 2229903, at *3 (S.D.N.Y. May 28, 2008); Rowley v. City of New York, 2005 WL 2429515, at *12-13 (S.D.N.Y. Sept. 30, 2005); Coville v. Ryder Truck Rental, Inc., 30 A.D.3d 744, 744-45, 817 N.Y.S.2d 179, 180 (3d Dep't 2006). If plaintiff failed to preserve his claims about the underlying alleged misconduct because he failed to file a timely administrative claim or because he simply does not have a viable claim on the merits, that does not justify permitting him to assert a negligence claim that is otherwise not recognized when the individual defendants acted within their capacities as employees.

In short, plaintiff's negligence claims against the City, however characterized, are legally defective.

72

C. Assessment of Plaintiff's Motion

Plaintiff has moved for partial summary judgment. He seeks a ruling that, as a matter of law, his arrest was without probable cause, and that accordingly defendants Milan, Ng and Conlon are liable to him on his Fourth Amendment and common-law claims for false arrest. He also asks for a ruling that if the individual defendants are liable on the state-law claim, the City should be deemed liable as well on a respondeat superior principle since the individuals were concededly acting within the scope of their employment when they arrested him. (Pl.'s Mem. in Supp. of Summ. J. 20-33).

The short answer to plaintiff's motion is that, for reasons already explored at some length, there are disputed facts material to the question of probable cause. See pp. 22-29, supra. At a minimum, the videotapes leave open and triable the issue of whether the police had a sufficient basis for concluding that Zhao had participated in some criminal activity on the night in question, and hence on that basis, if no other, summary judgment cannot be entered for plaintiff on these claims.[28]

---

[28] Plaintiff also argues in his summary-judgment motion that defendant City of New York is liable under the theory of vicarious liability for his state false-arrest claim. (Pl.'s Mem. in Supp. of Summ. J. 33-34). Since we find that there are genuine issues of material fact on this claim, it is not necessary for us

73

## CONCLUSION

For the reasons stated, we recommend that defendants' motion for partial summary judgment be granted in part and denied in part, and that plaintiff's motion for partial summary judgment be denied.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Lewis A. Kaplan, Room 1310, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

─────────────

to address this part of plaintiff's motion.

74

**DATED:** New York, New York
August 28, 2009

RESPECTFULLY SUBMITTED,

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been mailed today to:

Eric W. Siegle, Esq.
Jonathan D. Sims, Esq.
Siegle & Sims L.L.P.
217 Broadway
Suite 611
New York, New York 10007

Afsaan Saleem, Esq.
Jennifer Rossan, Esq.
Assistant Corporation Counsel
 for the City of New York
100 Church Street
New York, New York 10007